**ESTATE OF Emlyn JONES, Deceased, by Lorraine J. BLUME, its personal representative, Respondent,**

v.

**J. Peder KVAMME, Petitioner, Appellant,**

**John Kvamme, et al., Defendants.**

No. C9–87–2367.

Supreme Court of Minnesota.

Dec. 22, 1989.

Jeffrey F. Shaw, Briggs & Morgan, St. Paul, and C. Allen Dosland, Gislason, Dosland, Hunter & Malecki, New Ulm, for appellant.

Daniel P. Taber, Minneapolis, and Kevin O'C. Green, Mankato, for respondent.

COYNE, Justice.

The plaintiff Lorraine J. Blume, personal representative of the estate of Emlyn Jones, and defendant J. Peder Kvamme, separately obtained further review of a court of appeals decision affirming the plaintiff's award of $678,367.68 in rescissionary damages offset by a $5,500 purchase price of stock, together with $46,000 in punitive damages, in this action for rescission of a stock transfer based upon fraud. 430 N.W.2d 188. We affirm in part and reverse in part.

In 1928, Cecil Jones formed Kato Engineering Company, a closely-held corporation engaged in the manufacture of generators. As the president and chairman of the board, Cecil controlled the corporation and held 157 shares of the outstanding 180 shares of common stock. The remainder of the shares were held as follows: directors and officers William Cliff and Emlyn Jones held 11 shares and 10 shares respectively and, apparently, 2 shares were retained as treasury stock. The record discloses that while the defendant Kvamme became an assistant secretary of the corporation in 1961 and served as a director, he held no shares of common stock.

This action centers upon conversations and negotiations between Emlyn Jones and the defendant Kvamme which resulted in the sale of Emlyn's 10 shares of stock to Kvamme individually.

Beginning in 1964, Emlyn Jones began his severe decline in mental and physical health, having been diagnosed as suffering from cerebral arteriosclerosis, diabetes and senile dementia. The mild-mannered Emlyn had become irascible and had lost motor skills and control of his mental faculties. While he had never been involved in the financial operations of the company, he had successfully served as a trouble-shooter in the shop and, as Cecil's brother, had played a prominent role in the company.

The cumulative testimony of a number of current and former employees demonstrated the common understanding that, upon retirement, an employee was required to sell his stock back to the company in accordance with Cecil's long-standing policy. Illustrative of this was William Cliff's abortive attempt, which Cecil resisted, to trans-

fer his stock to his sons upon his retirement.

In 1966, when Emlyn's retirement was imminent, Kvamme visited his home and offered $5,500 for Emlyn's 10 shares. The offer was allegedly made in the name of the company, but when the sale was consummated, Kvamme paid for the stock with a counter check drawn on his personal account. The certificates were endorsed in blank and the stock transfer was not recorded on the books of the corporation; instead, the annual reports continued to show Emlyn as the owner until 1970 when, after his death, Kvamme was listed as the record owner. Kvamme later testified that, in fact, at the time of the purchase, he filled in the names of his children and put the certificate in his personal safety deposit box where it remained until 1978.

Kvamme became Kato's chief executive officer after Cecil suffered a stroke in 1974; he became the corporate president after Cecil's death in 1976. One year later, Kato Engineering was sold to Reliance Electric Company on an installment purchase agreement for approximately $12 million. Each share of Kato common stock was valued at approximately $65,000 and, upon distribution, the total amount paid for the 10 shares formerly owned by Emlyn was $678,367.68 including interest.

In June 1980, Blume discovered during conversations with counsel for the estate of Cecil Jones, that Kvamme had actually purchased Emlyn's stock individually rather than on behalf of the corporation. She commenced this action on February 18, 1982. The amended complaint alleged fraud and sought damages representing the value of the shares sold to Reliance Electric or, alternatively, rescission of the fraudulent transaction together with costs, disbursements, pre- and postjudgment interest and punitive damages. While the trial court bifurcated the proceedings, it is sufficient for our purposes to note that the jury ultimately found that Kvamme had obtained the stock fraudulently and that, at the time of the transaction, the stock was valued at $12,500 per share. It additionally awarded Blume $46,000 as punitive damages. The court entered a partial judgment in the amount of $165,500 representing the $12,500 per share minus the purchase price of $5,500, together with $46,000 in punitive damages. In the second portion of the proceedings, the trial court considered evidence on plaintiff's claim of the establishment of a constructive trust; in that portion of the proceedings, the court determined that in April 1978, Kvamme had transferred the 10 shares of stock to his children and directed him to pay rescissionary damages in the amount of the total proceeds obtained by virtue of the purchase of Kato Engineering by Reliance Electric together with $46,000 in punitive damages and costs and disbursements. The court rejected the plaintiff's claim for prejudgment interest. The court of appeals affirmed in all respects and we authorized further review.

We are called upon to address a host of issues. Kvamme first complains that the trial court erred in admitting portions of Blume's testimony relating to out-of-court statements made to her by her then husband, the decedent Emlyn Jones. Kvamme asserts that the testimony that Emlyn had stated the belief that only the corporation could repurchase the stock, that Kvamme was purchasing the stock on behalf of the corporate entity, and that he (Emlyn) intended to sell the stock only to the corporation constituted inadmissible and prejudicial hearsay, offered to prove the truth of the matters asserted. Minn.R. Evid. 801(c). In our view, the court of appeals properly approved the exercise of the trial court's broad discretion in admitting the evidence. While there can be no question that if Emlyn's alleged beliefs or understandings were offered to prove the fact that a material misrepresentation had occurred, the statements would be properly categorized as hearsay. 11 P. Thompson, *Minnesota Practice: Evidence* § 803.03, at 358 (1979). This determination, however, does not resolve the issue because an exception to the prohibition against admitting hearsay testimony exists with regard to statements "of the declarant's then existing state of mind, * * * but not including a statement of memory or belief to prove the

fact remembered or believed." Minn.R. Evid. 803(3).

While the challenged statements are susceptible to Kvamme's argument that the testimony was offered to establish indirectly that Emlyn formulated his belief that he was selling his stock to the corporation because of representations to that effect by Kvamme, such is the asserted vice of any hearsay. Here, however, the statement of a particular intention or belief at a certain time is competent evidence of the existence of Emlyn's belief, a matter directly relevant to a claim of fraud. *See Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892); *Scott v. Prudential Ins. Co.,* 203 Minn. 547, 552, 282 N.W. 467, 470 (1938). Accordingly, we conclude that the trial court did not abuse its discretion by admitting Blume's testimony as to Emlyn's state of mind because the statements were not admitted to prove an underlying fact believed but instead constitute circumstantial evidence of Emlyn's future reliance on Kvamme's statements that he was acting on behalf of the corporation.

■ Similarly, we agree with the appellate court's analysis in affirming the trial court's determinations with regard to the statute of limitations and the denial of Kvamme's post-trial motion for judgment notwithstanding the verdict. Kvamme urges this court to conclude that Blume knew or should have known all operative facts relative to her claim of fraud before 1980 and that her failure to conduct the necessary inquiry demonstrates a lack of diligence as a matter of law. *Bustad v. Bustad,* 263 Minn. 238, 243–44, 116 N.W.2d 552, 556 (1962). Accordingly, he asserts that the action is barred by the statute of limitations contained in Minn.Stat. § 541.05, subd. 1(6) (1988).

However, as correctly pointed out by the court of appeals, the question of when discovery could or should have reasonably been made is one of fact. *Murphy v. Country House Inc.,* 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976). The totality of the direct and circumstantial evidence adequately supports the jury's conclusion that neither the decedent Emlyn nor Blume had reason to suspect any misrepresentation or fraud before obtaining actual knowledge that Kvamme had purchased the stock on his own behalf.

■ Kvamme continues to maintain that the record is totally devoid of any evidence, direct or circumstantial, of any actionable misrepresentation and that, accordingly, the special verdict answers were manifestly contrary to evidence gathered at trial. The argument is not persuasive.

As acknowledged by the court of appeals, Kvamme's recitation of the events is clouded by numerous discrepancies and inconsistencies, all of which could well have contributed to the jury's apparent rejection of his credibility. Our own scrutiny of the record convinces us that while there is little direct evidence of the alleged fraudulent misrepresentation, there is more than ample cumulative circumstantial evidentiary support for the verdict. Most notable of that circumstantial evidence are the facts that Emlyn knew of and accepted Cecil's general policy that stock only be returned to the corporation and that, accordingly, when he sold the stock, it could be inferred that he did so with the expectation that it would be so returned. Moreover, Kvamme's concealment of his ownership of the shares until after Emlyn's death is quite telling. Accordingly, we cannot conclude, as Kvamme urges, that the answers to the special verdict were palpably contrary to the evidence. The trial court properly denied Kvamme's post-trial motion for judgment notwithstanding the verdict.

■ The most difficult aspect of this action relates to the proper measure of damages. Kvamme argues that the trial court erred by applying a "rescissionary" measure of damages which provided Blume with the value of the stock upon its sale in 1978 rather than its value in 1967, the time of the alleged fraud. A defrauded party may, under the "out-of-pocket" rule as applied in Minnesota, be entitled to damages in the amount paid less the value of the object of the fraud. *Weise v. Red Owl Stores, Inc.,* 286 Minn. 199, 204, 175 N.W.2d 184, 187 (1970); *see also Jensen v. Peterson,* 264 N.W.2d 139, 142 (Minn.1978)

(dictum). A defrauded party may, however, also sue for rescission of the contract. *Restatement of Restitution* § 166 comment b (1937). In such cases, the fraudfeasor holds the chattel in constructive trust for the defrauded transferor. *Wright v. Wright*, 311 N.W.2d 484, 485 (Minn.1981); *Blumberg v. Taggart*, 213 Minn. 39, 43, 5 N.W.2d 388, 390 (1942). The trust includes the proceeds of the chattel. *Id.* at 43, 5 N.W.2d at 390; *Restatement, supra,* § 202. An innocent donee of the chattel held in constructive trust owes the defrauded party the value of the chattel. *Restatement, supra,* § 204 comment b & illustration 1.

■ In our view, the trial court properly awarded rescissionary damages. *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965) is a paradigm example of the doctrine. There, the defendant induced plaintiffs to sell their stock by fraudulent concealment of inside information. Two years later, the stock had dramatically increased in value. Although it may have been purely "speculative" whether the plaintiffs would actually have profited in the same way had they retained the stock, the court held that they could recover the defendant's profits to prevent his unjust enrichment. *Id.* at 786. In other words, the court seemed to have fashioned relief to prevent the wrongdoer from the windfall benefit of his wrongful conduct. *See Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501–03 (Del.1981), *overruled on other grounds*, *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del.1983). We too have acknowledged that there are situations where a strict application of a rule of damages would not restore an injured party to its former position and have carved out an exception to the general rule. *B.F. Goodrich Co. v. Mesabi Tire Co.*, 430 N.W.2d 180, 183 (Minn.1988); *Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 200, 235 N.W.2d 831, 835 (1975). Accordingly, Blume is entitled to the profit from the sale of Kato stock in 1978 because Emlyn was the beneficiary of a constructive trust for the profits and, accordingly, Kvamme's children, as innocent donees of

the stock, owe to Blume the proceeds of the sale of their shares in the successor corporation. *Restatement, supra,* § 204 comment b & illustration 1.

■ Our conclusion that the estate holds a constructive trust on the proceeds of the stock, however, prompts us to find error in the trial court's award of punitive damages. There was obviously considerable confusion generated by the bifurcation of these proceedings and the instruction to the jury to award punitive damages before determining the appropriate measure for calculating damages. It is likely that the jury awarded punitive damages because it felt its original award of out-of-pocket damages of $125,000 would insufficiently compensate the estate for the stock while at the same time allowing Kvamme to retain the fruits of his misrepresentation, namely, the considerable dramatic appreciation of the stock. Here, the rescission of the transaction and the imposition of a constructive trust, rather than the compensation for out-of-pocket damages, has the effect of adequately restoring the estate to the status quo ante. As we held in *Jacobs v. Farmland Mut. Ins. Co.*, 377 N.W.2d 441, 445–46 (Minn.1985), permitting the rescission of the contract which restores the parties to the status quo ante should not be accompanied by a punitive damage award. While we find a limited distinction between the instant case and the facts presented in *Jacobs*, we reaffirm our pronouncement that the extraordinary remedy of punitive damages should not be extended to an "atypical rescission situation." *Id.* at 446.

■ We then address the estate's argument that the trial court erred in refusing to compute and award prejudgment interest pursuant to Minn.Stat. § 549.09, subd. 1 (1988). It urges this court to allow a computation of interest not only on the trust principal, but also on its income, that is, the interest paid to Kvamme's children under the installment purchase agreement with Reliance Electric Company.

However, we find the award of interest incompatible with the equitable imposition of a constructive trust on the proceeds of

the sale. In rescinding the transaction, the restoration of the parties to the status quo ante carries with it the return of the trust principal and its income to the defrauded party. Calculating the value of the trust itself requires an identification of the principal and interest paid by the purchaser as due; to require the trial court to engage in the difficult inquiry of ascertaining with precision the amount against which interest is calculated in this installment transaction would be to impose an almost impossible burden. Moreover, the statute contemplates an award of interest on "pecuniary damages." Even a strained definition of that term would not encompass the return of proceeds upon rescission of the original transaction.

Affirmed in part; reversed in part.

KELLEY, Justice (dissenting):

I respectfully dissent. The jury found that Kvamme defrauded Emlyn Jones, whose retirement from Kato Engineering Company was imminent as the result of his deteriorating health, when Kvamme represented that the 10 shares of Kato Engineering Company owned by Jones in 1966 were worth $5,500 and were being purchased by Kvamme on behalf of the company. That is the only claim of fraud. I agree that the evidence was sufficient to support the jury's finding.[1] But, I dissent as to the measure of damages applied by the majority.

If Emlyn, in fact, had the obligation upon retirement to sell his ten shares of stock back to the company, the redemption by the company obviously would have occurred within months of the time of his sale to Kvamme. As far as I have been able to ascertain from the record, all of the "evidence" in this case, with the exception of Kvamme's own testimony at trial, testimony which, as the verdict makes clear, was unpersuasive to the jury, was to the effect that there existed among the employees of Kato Engineering a common understanding that upon retirement employees could not retain stock or transfer it to others upon retirement. Ernest Mueller specifically so testified, and his testimony was corroborated by the fact that William Cliff was unable to transfer stock to his son when he retired. The hearsay statements of Emlyn, admitted for the purpose of showing his state of mind or belief, indicated that he was aware of and shared that understanding. Fae Bateman, a 40-year employee and vice president of the company, testified that Kvamme himself had told him at the time of Cliff's retirement that Cliff's common stock had to go back to the company treasury and was not transferable to a family member. Emlyn's nephew, Mueller, testified that from the company's earliest days everyone knew he or she was required to sell back his or her stock on retirement, and that Emlyn specifically knew that. Both Lorraine Jones and Emlyn's daughter testified that Emlyn believed the stock had to be sold back to the company, and Lorraine claims Peder Kvamme also so told her. To be sure, much of the recited testimony was presented by respondent in rebuttal to Peder Kvamme's self-serving trial testimony in which he denied the existence of such a company policy. Nevertheless, the other testimony in this case, from those who were in position to have knowledge, confirms that the redemption policy existed in 1966. Emlyn Jones, other company employees, Emlyn's wife and his daughter believed that the stock had to be sold, albeit to the corporation, then, or shortly thereafter, due to Emlyn's pending retirement. That being true, and I have been unable to find any "evidence" in the record to dispute it, it appears to me that regardless of Kvamme's fraud, Emlyn's stock would have been redeemed by Kato Engineering in 1966 for its then true value—approximately $122,500. Had it been re-

1. With respect to Kvamme's alleged misrepresentation that the corporation was redeeming the stock, to some extent it was bottomed on hearsay statements of Emlyn, which the majority concludes were properly admitted as a hearsay rule exception to reflect Emlyn's state of mind at the time of the transaction. There was other evidence, however, which would have supported a contrary conclusion—for example, that the stock was paid for not by the corporation, but rather by Kvamme's personal check.

deemed for that price, Emlyn and his survivors would have had that money and the income it generated thereafter. In effect, that is precisely what the jury restored to the Jones family—the value of the stock in 1966 and its increase from the date of the sale; but, in addition, the jury also awarded punitive damages of $46,000 as punishment to Kvamme for his fraud.

Had the stock been sold in 1966 to the corporation pursuant to the company's redemption "policy," presumably Emlyn would have been paid its value. When the corporation was sold many years later, he or his survivors would not then have been able to claim any part of any increment in its value. Moreover, had that scenario reflected the true situation, due to later acquisitions by Kvamme, unrelated to this transaction, ultimately Kvamme would have reaped the profit from the sale in 1978. The majority, in addition to affirming restitution in full, however, apparently would approve an additional penalty in excess of $½ million on the theory of unjust enrichment—even though had the 1966 transaction been as Emlyn then thought, and had he been paid the then true value of his stock, he or his survivors could have acquired nothing more. It seems to me that the missing link is causation. Nothing I find in the record justifies the assumption underlying the majority position, that had it not been for the fraud, Emlyn and his survivors would have realized this profit. Had Emlyn sold the stock back to the company in 1966, he would not have had the stock in 1978 to sell. Additionally, without the slightest doubt, many other factors contributed to the 1978 greatly inflated value of the corporation—factors which had nothing to do with Kvamme's jury-found fraud. Therefore, I suggest that the majority's reliance upon *Janigan v. Taylor* is misplaced. There, the alleged fraud related to a representation of the companies' business prospects as those prospects might affect the value of stock—a completely different setting, in my opinion, than we are faced with here.

By its verdict the jury awarded Emlyn's widow the true value of the stock at the time Emlyn sold it—less what Kvamme had paid him for it—for a net of $119,550. Additionally, the jury awarded $46,000 in punitive damages. Although the trial court rejected Lorraine's claim for prejudgment interest, in order to make the legal remedy purely compensatory, in my view she should recover pre and post verdict interest on both the compensatory and punitive damages from the date of the fraud. If that is done, I suggest that she would be afforded an adequate legal remedy, which substantially would place her in a status quo ante, making it unnecessary to resort to an alleged equitable remedy of rescission, which in itself, as approved by the majority, results in an unexpected, and what in my view might be characterized as an undeserved, windfall.