957 F.2d 588
 15 Employee Benefits Cas. 1033
 CONTINENTAL ASSURANCE COMPANY, Appellee,
v.
CEDAR RAPIDS PEDIATRIC CLINIC, et al., Appellants.
v.
CEDAR RAPIDS PEDIATRIC CLINIC EMPLOYEES PENSION PLAN AND
TRUST, et al., Appellants,
v.
CONTINENTAL ASSURANCE COMPANY, Appellee.
CITY LUMBER COMPANY, INC., et al., Appellees,
v.
CONTINENTAL ASSURANCE COMPANY, Appellant.
CONTINENTAL ASSURANCE COMPANY, Appellant,
v.
CEDAR RAPIDS PEDIATRIC CLINIC, et al., Appellees.
CONTINENTAL ASSURANCE COMPANY, Appellee,
v.
Dr. Bob E. HALL, et al., Appellants.
CONTINENTAL ASSURANCE COMPANY, Appellee,
v.
Robert T. LANE, et al., Appellants.*
 Nos. 90-1891, 90-1892, 90-1894, 90-1956, 90-1957 and 90-2094.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 8, 1991.
Decided Feb. 25, 1992.
 
 Ronald E. Bumpass, Fayetteville, Ark., argued, for appellants.
 Gary M. Elden, Chicago, Ill., argued (Gary M. Elden, Darrell J. Graham and Marc S. Lauerman, on the brief), for appellee.
 Before McMILLIAN, Circuit Judge, PECK,** Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 William Morton, who is not a party to any of these cases, was an insurance agent and a pension plan administrator. Morton sold many split-funded insurance contracts to pension plans, which provided insurance and also permitted deposits to "side accounts" for investment purposes. Continental Assurance Co. (CAC) issued one such contract, entitled GP-9395, to "William Morton as Agent for Certain Qualified Plans." This plan was designed to allow smaller pension plans to achieve economies of scale by grouping together. Morton received several million dollars from various pension plans to invest in side accounts. Some of these deposits were intended for contract GP-9395; others may have been intended for other CAC insurance contracts, although CAC disputes this. Most of the funds were converted by Morton for his personal use. Although Morton was convicted of embezzlement, the funds were not recovered because he was bankrupt.
 
 
 2
 Twelve pension plans sued CAC for recovery of the stolen funds, alleging that Morton was CAC's general agent and therefore CAC was liable for their losses. CAC filed counterclaims and third-party suits against the trustees of the plans and against three contract administrators seeking contribution and indemnity. The district court granted summary judgment in favor of the trustees and contract administrators on the counterclaims and third-party suits.[1] The trustees and contract administrators then moved for costs and attorneys' fees, but the district court denied these motions.[2] The trustees and contract administrators appeal the denial of attorneys' fees and costs, and CAC appeals the summary judgment. Additionally, the district court directed a verdict against seven of the plans because they understood that they were investing in GP-9395 and that the contract stated on its face that Morton was acting as the plan's agent.[3] These plaintiffs appeal. Finally, the jury awarded the five remaining plaintiffs 1.2 million dollars.[4] CAC moved for judgment notwithstanding the verdict (jnov) and for a new trial. The district court denied these motions and CAC appeals.
 
 
 3
 For the reasons discussed below, we affirm the summary judgment against the seven pension plans that had expressly authorized Morton to invest in GP-9395, but reverse the judgments in favor of the five pension plans and against CAC and remand the case to the district court for further proceedings consistent with this opinion. We therefore need not reach the issue of the district court's grant of summary judgment in favor of the trustees and the contract administrators. Finally, we affirm the district court's denial of the motions of the trustees and the contract administrators for attorneys' fees and costs.
 
 I. BACKGROUND
 
 4
 For more than thirty years, Morton was an insurance agent in northwesern Arkansas, eastern Oklahoma and Cedar Rapids, Iowa. Beginning in 1955, Morton sold insurance for CAC as a "general agent" authorized to accept premium payments and remit the premiums net of his commission to CAC. Paragraph 12 of the agreement between CAC and Morton provided in part: "general agent shall be responsible [to CAC] for all monies due it for premiums or otherwise received by him." Morton sold various kinds of insurance policies, including pension plans to companies, including the twelve plaintiffs here. In addition to his insurance business, Morton owned other businesses, including Morton & Co., which provided administrative, actuarial and consulting services to small pension plans.
 
 
 5
 One funding mechanism available to pension plans is an Immediate Participation Guarantee (IPG) with a qualified insurance company. An IPG guarantees the pension plan the return of principal and a certain minimum rate of interest. The insurer also usually pays "excess" interest, that is, in addition to the guaranteed minimum rate. The insurer then charges the pension plan a fee based upon a percentage of the amount deposited. The larger the amount deposited, the lower the percentage charged as a fee. In 1974, Morton asked CAC to allow him to "pool" some of his smaller pension plans into a single, group IPG contract in order to reduce administrative costs, such as the fee charged by the insurer, and increase their rates of return. Morton would act as agent for the plans and would provide all bookkeeping and administrative services in order to allocate proceeds from the pooled funds among the various plans. CAC drafted an agreement embodying this proposal and the modified IPG contract was assigned number GP-9395. CAC officials testified that less than half a day's thought went into issuing the plan. CAC understood that the plan would be marketed to Morton's existing clients and that Morton would be issuing year-end fund statements to the GP-9395 participants. CAC had no knowledge of the amount that individual participants of GP-9395 had on deposit. In connection with the creation of GP-9395, CAC and Morton executed a commission agreement. The agreement stated in part: "The following agreement entered into between Morton & Co., Inc. herein called general agent of Fayetteville, Arkansas, and Continental Assurance Company, herein Company, on this 17th day of May, 1974." Under this agreement, Morton was to receive commissions for funds deposited in GP-9395. CAC stopped paying commissions on GP-9395 when the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., was enacted.
 
 
 6
 Instead of depositing funds into GP-9395, Morton retained the funds for personal use. It is unclear how much money Morton embezzled, but it may be more than six million dollars.
 
 
 7
 This case against CAC involves twelve pension plans from which Morton embezzled. Plaintiffs allege that Morton was a general agent for CAC and, therefore, CAC is liable for the money Morton embezzled. At trial, plaintiffs alleged that Morton was CAC's agent, either actually or apparently, and as such CAC was liable for Morton's actions. Plaintiffs also alleged that CAC was liable under ERISA as a fiduciary or as a non-fiduciary who participated in a breach of trust.
 
 
 8
 There are two different groups of pension plans involved in this appeal. The district court granted a directed verdict in favor of CAC with respect to the following seven plaintiffs: Credit Bureau of Fort Smith, Inc. (Credit Bureau), Edwards Funeral Home Profit Sharing Plan and Trust (Edwards), Farmers and Merchants Bank Pension Plan (F & M Bank), George's, Inc. Profit Sharing Plan and Trust (George's), Southern Sheet Metal Works, Inc. Pension Plan (Southern Sheet Metal), Cedar Rapids Pediatric Clinic Employees Pension Plan and Trust (Cedar Rapids), and Shipley Baking Co. Pension Plan and Trust (Shipley Baking). These seven plaintiffs appeal the district court's directed verdict in favor of CAC.[5]
 
 
 9
 The claims of the other five plaintiffs went to the jury which awarded them 1.2 million dollars. These plaintiffs include City Lumber, Inc. Pension/Retirement Plan (City Lumber), NWA Steel Co., Inc. Pension Plan (NWA), Madison County Telephone Co., Inc. Retirement Plan (Madison County), First National Bank of Springdale Pension Fund (First National Bank), and Lewis Ford Sales Pension Plan (Lewis Ford). CAC appeals the district court's judgment in favor of these plaintiffs and argues the district court erred in denying its post-trial motions for jnov and new trial.[6]
 
 
 10
 The third group of parties involved in this appeal are the contract administrators and trustees. CAC filed counterclaims and third-party claims for contribution and indemnity against the plans' trustees and others who had provided certain services to the plans. The district court granted the contract administrators' and trustees' motions for summary judgment and dismissed CAC's claims for contribution or indemnity on the ground that fiduciaries have no right to contribution or indemnity under ERISA. CAC appeals this denial. These contract administrators and trustees also appeal the denial of their motions for attorneys' fees and costs under ERISA.
 
 II. DIRECTED VERDICT
 
 11
 The district court granted a directed verdict in favor of CAC and against seven plaintiffs. Those plaintiffs appeal. Plaintiffs[7] argue the district court erred in granting CAC's motion for a directed verdict because agency is a jury question. While we agree that the question of agency is a jury question "in most instances," Northern v. McGraw-Edison Co., 542 F.2d 1336, 1343 (8th Cir.1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977), we hold that this is a case where a directed verdict is appropriate as a matter of law.
 
 
 12
 Plaintiffs argue that looking at the evidence in the light most favorable to them, as the non-moving parties, a jury could reasonably conclude that Morton was an agent of CAC. Even if we accept this conclusion, as a matter of law, plaintiffs still are not entitled to relief. The evidence clearly showed that Morton was plaintiffs' agent with respect to the GP-9395 contract. The GP-9395 contract between CAC and Morton expressly stated that Morton was an agent of plaintiffs. Additionally, five of the seven plaintiffs (all but George's and Edwards) hired Morton to administer their plans. At least four of plaintiffs (Edwards, George's, Southern Sheet Metal and Shipley Baking) received certificates of participation which identified that plaintiffs were contributing to the GP-9395 contract "issued by Continental Assurance Company to MORTON & CO., INC., as Agent for Certain Qualified Plans." Furthermore, all plaintiffs except Cedar Rapids signed limited powers of attorney appointing Morton & Co. as their attorney to deal with CAC with respect to the GP-9395 contract. These plaintiffs clearly appointed Morton as their agent with respect to the GP-9395 contract. Therefore, even under plaintiffs' agency theory, Morton was acting as a dual agent, that is, an agent for both CAC and plaintiffs.
 
 
 13
 Plaintiffs argue that Arkansas law does not allow dual agents, and therefore, that we cannot apply the rule of dual agents. Plaintiffs rely on Fennell v. Ross, 289 Ark. 374, 711 S.W.2d 793 (1986) (Fennell ). Fennell involved the issue of whose agent a real estate broker is in the case of the sale of a house. The Arkansas Supreme Court held that the broker was an agent of the seller and summarily concluded that "[t]he law of agency contemplates that an agent may serve only one principal with respect to any one transaction." Fennell, 711 S.W.2d at 796 (citations omitted). We do not read this statement to mean that dual agents are never allowed in Arkansas. In our view Fennell does not involve dual agency. We read Fennell as limited to its facts of determining that a real estate broker is the agent of the seller, not the buyer, and therefore, the broker's knowledge cannot be imputed to the buyer.
 
 
 14
 Instead we rely the law on dual agents as follows:
 
 
 15
 [O]ne principal is not civilly liable to another [principal] for the tortious acts of an agent who acts for both parties with their consent, unless he [or she] in some manner participates in the wrong. In other words, the misconduct of a dual agent by consent cannot be imputed to either of the principals who is not actually at fault, since each of the principals is under an equal duty to exercise ordinary care in selecting and supervising the agent to protect his [or her] own interests.
 
 
 16
 3 Am.Jur.2d Agency § 280 (1986) (footnotes omitted). See Cerniglia v. Pretty, 674 F.Supp. 1167 (D.Md.1987); Hodges v. Mayes, 240 Ga. 643, 242 S.E.2d 160 (1978); Fuchs v. Leahy, 321 Mo. 47, 9 S.W.2d 897 (1928); Whittlesey v. Spence, 439 S.W.2d 195 (Mo.Ct.App.1969); 3 C.J.S. Agency § 430 (1973). This principle is directly applicable here. CAC clearly consented to this dual agency representation in its GP-9395 contract with Morton which listed Morton & Co. as agent for certain qualified plans. CAC was therefore aware of both its agency relationship with Morton as well as plaintiffs. Plaintiffs were equally aware of the dual agency relationship. Plaintiffs appointed Morton as their agent by executing limited powers of attorney and by appointing Morton as a plan administrator. Plaintiffs were given documentation of this agency relationship on their certificates of participation. Plaintiffs were also aware of and consented to Morton's agency relationship with CAC. Plaintiffs had dealt with Morton as an insurance agent of CAC and were buying a product, group annuity contract GP-9395, which Morton was selling on behalf of CAC. Plaintiffs were aware that Morton was authorized to accept premium payments on behalf of CAC and did in fact write checks to Morton & Co. In fact, plaintiffs even argue in their brief that Morton had apparent, if not actual, authority to act on behalf of CAC. Plaintiffs emphasize the fact that CAC allowed Morton to issue year end fund statements on CAC stationary, to give out literature and business cards provided by CAC, and to collect premiums on behalf of CAC as proof that CAC held Morton out as an agent. Plaintiffs' apparent authority argument shows that plaintiffs were aware of the agency relationship between CAC and Morton.
 
 
 17
 The Tenth Circuit faced a similar question in another case involving CAC and pension funds from which Morton embezzled money. National Football Scouting, Inc. v. Continental Assur. Co., 931 F.2d 646 (10th Cir.1991). In that case, the district court granted summary judgment in favor of CAC because Morton was not as a matter of law CAC's agent and alternatively because the dual agency principle barred the plaintiffs' relief. Id. at 647. The Tenth Circuit reversed, finding genuine issues of material fact with regard to Morton's agency. Id. at 650. We disagree with the Tenth Circuit and believe that because of the dual agency principle, CAC is entitled to a directed verdict as a matter of law. We therefore affirm the district court's grant of a directed verdict in favor of CAC and against the seven plaintiffs.
 
 
 18
 III. CAC'S APPEALS FROM JUDGMENTS IN FAVOR OF PLAINTIFFS
 
 
 19
 Five plaintiffs received jury verdicts against CAC totalling 1.2 million dollars. The district court denied various post-trial motions and entered judgments upon the jury verdicts in favor of the five plaintiffs and against CAC. CAC first argues that plaintiffs'[8] claims are barred by the statute of limitations. This argument has no merit. The ERISA statute of limitations, found in 29 U.S.C.A. § 1113 (West Supp.1991), states that "in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." The evidence at trial showed that Morton actively concealed his theft from plaintiffs by sending them statements on CAC letterhead indicating their accounts were intact. There was evidence indicating that the fraud was not discovered until 1986, when CAC notified one of the plans that its account balance was insufficient to cover a requested withdrawal. Consequently, we conclude there was sufficient evidence for the jury to conclude that the claims were brought within the limitation period.
 
 
 20
 CAC also argues that it is entitled to a judgment as a matter of law or in the alternative to a new trial. Glass Design Imports, Inc. v. Import Specialties, 867 F.2d 1139, 1142 (8th Cir.1989). We hold that the district court should have granted CAC jnov on the dual agency principle. As discussed above, the key issue is whether Morton was an agent of plaintiffs. If Morton was an agent of plaintiffs, then even if Morton was also an agent of CAC, plaintiffs are not entitled to relief because of the dual agency principle discussed above.
 
 
 21
 Plaintiffs' theory at trial was that they never signed any power of attorneys, received certificates of participation, or gave Morton money to deposit in GP-9395. Instead, the money they gave to Morton was to be deposited in the side fund accounts associated with their cancelled insurance contracts with CAC. Plaintiffs alleged that while they were aware that they had cancelled their insurance contracts, they were unaware that by cancelling their insurance contracts, they were also cancelling the side funds associated with the insurance contracts.
 
 
 22
 Even if the jury believed this theory, we hold that no reasonable jury could have found that Morton was not plaintiffs' agent. Morton was given a great deal of discretionary authority by the plaintiffs and this leads to the conclusion that Morton was acting as their agent. All of the plans hired Morton to perform actuarial and administrative services for the plans. Morton was a trustee of City Lumber beginning in 1964 and until 1976. As trustee, Morton signed an application for an insurance policy from CAC in 1972. Madison County's trustee, Curtis Shrum, testified that he hired Morton to handle all pension plan management and turned all investment decisions over to Morton and that Morton had the authority to invest Madison County's funds at his discretion. First National Bank wrote to CAC in 1982 giving Morton the authority to receive money on behalf of First National Bank. First National Bank Executive Vice-President, Max Sample, who wrote the letter, testified that the letter instructed CAC to treat Morton as if he were a trustee of the Bank's pension plan. On two occasions, checks from CAC to the Bank's trustees were endorsed to Morton & Co. and delivered to Morton.
 
 
 23
 The fact that plaintiffs mistakenly believed they were depositing money into the side fund accounts and had no knowledge of GP-9395 is not dispositive. Plaintiffs still allowed Morton to act as their agent and, as such, they are now barred from obtaining relief from CAC by the dual agency principle. It was unreasonable for the jury to find otherwise and accordingly we reverse the district court's judgment in favor of plaintiffs and against CAC and remand for further proceedings consistent with our opinion.
 
 IV. CONTRIBUTION AND INDEMNITY
 
 24
 CAC counterclaimed against plaintiff plan trustees and brought in other plan trustees and contract administrators as third-party defendants. CAC claimed contribution and indemnity against these parties. The district court dismissed these actions and CAC now appeals. Because of our decisions above, we need not reach this issue on appeal.
 
 V. ATTORNEYS' FEES AND COSTS
 
 25
 Finally, the trustees appeal the district court's denial of their motion for attorneys' fees and costs incurred in defending the contribution and indemnity action. ERISA's attorneys' fee provision provides: "In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The factors a court should consider in exercising its discretion under ERISA to award fees to the prevailing party are set forth in Lawrence v. Westerhaus, 749 F.2d 494 (8th Cir.1984) (per curiam) (Lawrence ):
 
 
 26
 (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal [question] regarding ERISA itself; and (5) the relative merits of the parties' positions.
 
 
 27
 Id. at 496, citing Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir.1980).
 
 
 28
 In denying the trustees' motion for attorneys' fees and costs, the district court set forth the factors enunciated in Lawrence and stated:
 
 
 29
 The court has read and carefully considered the briefs submitted on this question. The court does not believe that the counterclaim and third-party complaint in this case were brought in bad faith or that the arguments propounded in support of them were frivolous. The court will therefore deny the motions for fees and costs.
 
 
 30
 Cedar Rapids Pediatric Clinic v. Continental Assur. Co., No. 86-5192, slip. op. at 2 (W.D.Ark. Apr. 14, 1991).
 
 
 31
 The trustees assert that the district court abused its discretion because it failed to consider several of the Lawrence factors. In support, they cite this court's holding in United States v. Kramer, 827 F.2d 1174 (8th Cir.1987), that:
 
 
 32
 An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.
 
 
 33
 Id. at 1179, citing Kern v. TXO Production Corp., 738 F.2d 968, 970 (8th Cir.1984). The trustees contend that the district court limited its analysis to the first factor from Lawrence. Therefore, they argue that this court should reverse the district court's ruling and remand for reconsideration of their motion for attorneys' fees and costs.
 
 
 34
 We disagree. It is clear from the district court's opinion that the court was aware of the Lawrence factors and applied them. Under the circumstances of this case, where this circuit has not addressed a significant legal question regarding fiduciary claims for contribution and indemnity under ERISA which other circuits have disagreed on, the district court's finding that CAC's claims were not frivolous implicitly resolved in CAC's favor all of the Lawrence factors except CAC's ability to satisfy a fee award. The ability to satisfy a fee award is not relevant when the other factors dictate against awarding fees. Accordingly, we hold that the district court did not abuse its discretion in declining to award fees to the trustees and contract administrators.
 
 VI. CONCLUSION
 
 35
 In sum, we hold that the district court did not err in granting a directed verdict in favor of CAC and against the seven plaintiffs and affirm this part of the district court's judgment. We also hold that the district court should have granted jnov in favor of CAC and against the five plaintiffs and reverse that part of the district court's judgment. We also hold that the district court did not abuse its discretion in denying the trustees' and contract administrators' motion for attorneys' fees and costs. We need not decide the contribution and indemnity issues in view of our decision in favor of CAC on the merits.
 
 
 36
 Accordingly, we affirm in part, reverse in part and remand the case to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 The full caption of these consolidated cases is on file in the office of the Clerk of the United States Court of Appeals for the Eighth Circuit
 
 
 **
 The Honorable John W. Peck, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 Cedar Rapids Pediatric Clinic v. Continental Assur. Co., No. 86-5192 (W.D.Ark. Feb. 17, 1991) (order granting summary judgment)
 
 
 [2]
 Id. (Apr. 14, 1991) (memorandum opinion denying attorneys' fees)
 
 
 [3]
 Id. (Apr. 25, 1991) (final judgment)
 
 
 [4]
 Id
 
 
 [5]
 CAC has subsequently settled with Farmers and Merchants Bank Pension Plan and its appeals were dismissed pursuant to our February 18, 1992, order
 
 
 [6]
 CAC subsequently settled with NWA Steel Co., Inc. Pension Plan and Lewis Ford Sales Pension Plan and their appeals were dismissed pursuant to our February 18, 1992, order
 
 
 [7]
 Plaintiffs throughout this section refers to the six plaintiffs against whom directed verdicts were entered by the district court and who have not settled with CAC
 
 
 [8]
 Plaintiffs throughout this section refers to the three plaintiffs who received jury verdicts and who have not settled with CAC