_____

No. 95-1494
_____

Sandra Barry, also known as          *
Sandra Barry Lieberman,              *
an individual,                       *
                                     *
             Appellant,              *     Appeal from the United States
                                     *     District Court for the
        v.                           *     District of Minnesota.
                                     *
Charles L. Barry, Melanie G.         *
Barry, Lawrence Swartz, Marcia       *
Barry Swartz, Twin City Fan          *
and Blower Company, a                *
Minnesota corporation,               *
                                     *
             Appellees.              *


_____

        Submitted:  October 17, 1995

          Filed:  March 12, 1996
_____

Before McMILLIAN, BOWMAN, and WOLLMAN, Circuit Judges.
_____

WOLLMAN, Circuit Judge.


     Sandra Barry Lieberman appeals the district court's grant of summary
judgment to defendants on her claims for fraud, breach of fiduciary duty,
and breach of contract surrounding the sale of her shares of stock in a
family-owned business.  Because we find that factual questions remain, we
reverse and remand for a jury determination of the issues.


**I.**


     Lieberman owned one-third of the shares of stock in Twin City Fan and
Blower Company (Twin City), a Minnesota corporation founded by her father.
Lieberman's brother, Charles Barry, and his wife,

Melanie Barry, and Lieberman's sister, Marcia Barry Swartz, and her husband, Lawrence Swartz (the Barrys), owned the remaining shares in equal proportions. Charles Barry and Lawrence Swartz managed the company. Lieberman, who lived in California where she worked as a special education teacher, had no involvement in the company.

In May 1983, Lieberman received a telephone call and a letter from Richard Fitzgerald, Twin City's attorney, informing her that the company was losing money and that the managing shareholders were contemplating moving the company to South Dakota, which would require additional capital input by the shareholders and increased personal financial risks. The letter advised Lieberman not to undertake those risks, as she was not involved in the management of the company, and recommended that she sell her shares of the stock to Twin City. The letter suggested that Twin City would buy Lieberman's stock for a $335,000 lump sum payment due in ten years, plus an additional $25,000 every year until the lump sum payment was made.

Lieberman retained California and Minnesota attorneys while she considered her options. Twin City provided Lieberman's attorneys with financial statements that showed a 1982 loss of $138,865 and an "Internal Mgmt Report" for 1983 that showed losses in each of the first five months of the year totalling $168,895. Lieberman was reluctant to sell her shares, however, because her father had stressed to her never to sell.

In June 1983, the Barrys sent Lieberman notice of a Twin City shareholder meeting and announced a merger plan under which Lieberman would receive $125,000 for her 5,000 shares and informed her that she could pursue her dissenting shareholder's rights under Minnesota law. Believing that she was being forced to sell her shares and that she would receive less under the Minnesota dissenter's rights statute than the Barrys had originally offered based on the financial information she had been given, Lieberman

accepted the terms set out in Fitzgerald's original letter.

In October 1983, Lieberman signed a stock redemption agreement to sell her stock according to the terms stated in the letter. The agreement included a general release clause. It also provided that if the Barrys undertook certain stock transactions Lieberman's note would become immediately due, with Lieberman to then receive 10% of any profits in excess of $1 million. Lieberman's mother agreed to guarantee Twin City's note to Lieberman. Lieberman's mother also placed one-third of her estate in an irrevocable trust for Lieberman.

In 1988, without informing Lieberman, the Barrys initiated a series of transactions that affected the corporate structure of Twin City and which resulted in the Barrys owning stock in their same proportion in another corporation, which will be discussed in greater detail in Section V. In 1990, Twin City paid Lieberman the $335,000 lump sum that was due in 1993.

In 1991, Lieberman received a call from Charles Barry, who told her that he had bought out the Swartzes' stock for $15 million. This led Lieberman to investigate whether she was entitled to additional consideration under the terms of the stock redemption agreement. Lieberman found that in 1983 Twin City had submitted financial statements to South Dakota bond underwriters showing figures for the company's operations different from those which she had been given. The numbers submitted to the underwriters showed that Twin City had actually made a profit from January to May of 1983, whereas the numbers Lieberman had been given showed a loss for the company during each of those months. She also discovered the company's 1988 stock transactions.

Lieberman then brought this action against the Barrys and Twin City, alleging seven causes of action. The district court granted summary judgment to the Barrys and Twin City on all except the

breach of contract claim. The court found that the six-year statute of limitations barred Lieberman's remaining claims, including her fraud and breach of fiduciary duty claims, because "through the exercise of reasonable diligence plaintiff could have discovered those alleged misrepresentations more than six years prior to commencement of this action." The court additionally held that the claims would be barred by the release Lieberman signed, finding that because the statute of limitations barred her fraud claim, Lieberman could not claim that the stock redemption agreement was unenforceable. The court denied summary judgment, however, on Lieberman's breach of contract claim relating to Twin City's 1988 transactions, after finding that a question of fact existed as to whether the corporate changes that took place in 1988 were included in the contract language and required a determination of the parties' intent.

After the case was transferred to another judge, however, the court granted the Barrys and Twin City summary judgment on the breach of contract claim as well, finding that because ownership of the stock did not change, the reorganization was not a "sale" within the plain meaning of the word. Lieberman appeals only the dismissal of her fraud, breach of fiduciary duty, and breach of contract claims.

We review the district court's grant of summary judgment de novo, and we will affirm if the evidence, viewed in the light most favorable to the non-moving party, shows that no dispute of material fact exists and that the moving party is entitled to judgment as a matter of law. Michalski v. Bank of America Ariz., 66 F.3d 993, 995 (8th Cir. 1995). Because this is a diversity case, we also review de novo the district court's interpretation of state law. Id. (citing Salve Regina College v. Russell, 499 U.S. 225, 231 (1991)).

-4-

## II.

We first address Lieberman's motion to strike supplemental documents submitted to this court by the Barrys and Twin City. These documents were not part of the record before the district court when it entered its order granting partial summary judgment. We will consider only evidentiary materials that were before the trial court at the time the summary judgment ruling was made. Fed. R. App. P. 10(a); Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1489-90 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993). Excluded from the appellate record is evidence that was submitted to the trial court subsequent to the ruling. United States East Telecommun. v. US West Commun. Servs., Inc., 38 F.3d 1289, 1301 (2d Cir. 1994). Although the district court had the right to change its previous summary judgment ruling until the order was final, see Fed. R. Civ. P. 54(b), it did not do so; thus, the district court did not address the significance of the additional information to the statute of limitations and release issues.

Those cases which hold that we may expand the record on appeal are readily distinguishable. In Dakota Industries, Inc. v. Dakota Sportswear, Inc., 988 F.2d 61, 63-64 (8th Cir. 1993), we allowed the parties to expand the record because the parties had not had a chance to complete discovery and because one party's misrepresentation left the district court with an incomplete picture. We noted that the authority to enlarge a record is rarely exercised and constitutes a narrow exception to the general rule that it is only the record made before the district court which the appellate court may consider. Id. at 63. In Miller v. Benson, 51 F.3d 166, 168 (8th Cir. 1995), we allowed the pro se appellant to expand the record because he did not learn that the district court had not received his motion until after that court dismissed his case.

The Barrys and Twin City offer no reason why the records they now wish to submit were not submitted with the initial motion for summary judgment. We thus grant Lieberman's motion to strike portions of Barrys' and Twin City's addendum and appendix, and we will not consider the arguments which rely on the stricken evidence.

**III.**

We next address the Barrys' and Twin City's argument that Lieberman's fraud claim is barred by Minnesota's six-year limitations period for such claims. See Minn. Stat. § 541.05, subd. 1(6) (1992). We find that a factual question exists as to whether Lieberman could have discovered with reasonable diligence that Barrys gave her false financial figures.

The six-year limitations period begins to run when a plaintiff knew or should have known of the fraud. See Estate of Jones v. Kvamme, 449 N.W.2d 428, 431 (Minn. 1989). The question of when discovery could or should have reasonably been made is one of fact. Id. The plaintiff bears the burden of proving that she could not, through reasonable diligence, have discovered the facts constituting the fraud until within six years of the commencement of the action. Blegen v. Monarch Life Ins. Co., 365 N.W.2d 356, 357 (Minn. Ct. App. 1985).

In finding that Lieberman did not exercise reasonable diligence, the district court stated that Lieberman was "sufficiently skeptical of defendants' motivations in pursuing the buyout to raise suspicions that defendants might not be completely forthcoming in the information provided to [her]." The court pointed out that Lieberman felt as though the Barrys were telling her they wanted a "divorce"; she felt the Barrys would do whatever it took to force her out of the company; she immediately retained attorneys, who negotiated a detailed contract for her; she enlisted

a friend to help her analyze the company's financial position; she obtained a guaranty on the note from her mother; and she protected her right to inherit one-third of her mother's estate.

Lieberman submitted the affidavit of Robert Bartkus, Twin City's Controller from 1976-80 and 1982-86, who attested that he had prepared the books for the South Dakota bond issue, that he did not prepare the statements that Lieberman received, and that both sets of financial statements could not be correct. He attested that the statements given to Lieberman were truthful in the areas that could be easily verified, and were believable based on the 1982 statement, but that one principal difference between the two sets of statements related to "material from inventory." According to Bartkus, finding the true data in that area would have required an audit of physical inventory, which might have necessitated a one-day plant shutdown. Such verification was not required even for Twin City's bond offering.

We disagree with the district court's conclusion that the circumstances triggered a duty by Lieberman to check into the truthfulness of the data the Barrys provided to her. Although some of the factors recited by the district court may have made it unreasonable for Lieberman to rely on the Barrys' characterization of the financial condition of the company, Lieberman did not rely on those characterizations. Instead, she hired attorneys and consulted a financial advisor to advise her about the company's financial position. Lieberman's advisors, however, were unable to discover the company's true financial condition because of the Barrys' fraudulent concealment of the profits for 1983. See Continental Assurance Co. v. Cedar Rapids Pediatric Clinic, 957 F.2d 588, 593 (8th Cir. 1992) (false financial statements on company's letterhead were sufficient for the jury to find active concealment and toll federal statute of limitations); Cohen v. Appert, 463 N.W.2d 787, 790 (Minn. Ct. App. 1990) (to toll limitation period, fraudulent concealment must be intentional and

must prevent discovery of cause of action).

The Barrys and Twin City argue that because the correct financial information was a matter of public record during Twin City's bond offering, Lieberman could have found the information at that time, and that Lieberman foreclosed any opportunity to later discover the fraud by cutting herself off from her family and refusing to communicate with them. We find no obligation under Minnesota law, however, for a plaintiff to investigate after the fact. Because the bond offering and lack of communication came after Lieberman had already sold her stock, she was not guilty of lack due diligence by failing to later discover the fraud.

The Barrys and Twin City also argue that Lieberman would have discovered the false information if she had pursued her dissenter's rights under the Minnesota statute. Lieberman argues, however, that according to the financial information available to her at the time, she had every reason to believe such action would leave her in a worse position than accepting the Barrys' original offer.

We conclude that a jury could reasonably believe that Lieberman exercised due diligence in accepting the financial statements as true without putting the company through an extensive audit of its physical inventory or without fruitlessly pursuing her dissenter's rights.

**IV.**

We next turn to the issue whether the release signed by Lieberman was valid and whether it bars her fraud claim. We find, again, that factual issues remain to be determined whether the Barrys fraudulently induced Lieberman to sign the release.

A release may be invalidated if fraud "touches" it. Noble v. C.E.D.O., Inc., 374 N.W.2d 734, 744 (Minn. Ct. App. 1985).

-8-

Lieberman argues that the Barrys' fraudulent financial figures induced her to sign the release.  The Barrys and Twin City argue that Lieberman could not justifiably rely on the financial information, given the relationship of the parties at the time of the release.

The Barrys and Twin City submitted to the district court a letter from Twin City's attorney, Fitzgerald, to Lieberman's attorney, which in part refused an apparent attempt by Lieberman's attorney to have the Barrys warrant that the financial information they provided was true.  The refusal was based on a desire to "wipe[] the slate clean," and on the Barrys' belief that if they made a lot of money by moving to South Dakota a future claim by Lieberman would be unfair.  The Barrys and Twin City argue that the refusal to provide the requested warranty rendered Lieberman's reliance on the financial information unjustified.

We believe that Fitzgerald's refusal leaves the impression that the Barrys were unwilling to warrant the future projections they had provided, rather than that the historical financial information was false.  We cannot say that Fitzgerald's refusal made Lieberman's reliance on the false financial information unjustified as a matter of law.  Cutting against the refusal are the apparent truthfulness of the information and the family relationship.  Under Minnesota law, a party may rely on the truthfulness of business records unless their falsity is obvious.  Speiss v. Brandt, 41 N.W.2d 561, 566 (Minn. 1950).

The Barrys and Twin City also argue that fraud claims can be released and that if the release in this action is not valid, no release could be valid.  The Barrys and Twin City fail to recognize, however, the difference between releasing mature fraud claims that a plaintiff knows exist, and releasing the very fraud that induced the plaintiff to sign the release. Although the later discovery of additional fraud does not invalidate the release of a

mature fraud claim, see Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 527 (2d Cir. 1985), the same principle does not apply when a plaintiff who justifiably relies on fraudulent information is induced to sign a release for fraud claims that she did not know existed.

## V.

Finally, we address Lieberman's breach of contract claim. Among other things, the contract provided that Lieberman would receive additional consideration in the event "(4) the sale of shares of the Corporation . . . to the Corporation which results in . . . the Corporation owning 80% or more of the outstanding shares of the Corporation."

The specific corporate changes that took place in 1988 were as follows: (1) Twin City was renamed TCF Blower Division; (2) the Barrys formed two other separate corporations, TCF Axial Division, Inc. and TCF Industries, Inc.; (3) the Barrys' shares in TCF Blower Division were cancelled; (4) both the Blower Division and the Axial Division issued 10,000 shares of stock each to TCF Industries; and (5) TCF Industries issued 2,500 shares of stock to each of the Barrys. Lieberman argues that the transaction constituted a sale of shares to the corporation in exchange for stock in TCF Industries and that she is thus owed additional consideration under the fourth scenario in the contract.

In the first district court opinion, the court found that "the 1988 changes were arguably triggering events within the literal terms of the contract," but found that there was evidence that the parties did not intend Lieberman to receive additional consideration unless the corporation came under the control of outsiders. Thus, the court found that a jury issue remained. After the case was transferred, the successor court found that there was "no sale in the traditional or common sense of the term,"

as there was not a buyer and seller.

Under Minnesota law, the court must first determine as a matter of law whether a contract is ambiguous. Lamb Plumbing & Heating Co. v. Kraus-Anderson of Minneapolis, Inc., 296 N.W.2d 859, 862 (Minn. 1980). A contract is ambiguous if its language is reasonably susceptible to more than one interpretation. Trondson v. Janikula, 458 N.W.2d 679, 681 (Minn. 1990). The court should consider the context in which a word is being used to determine whether it is ambiguous, Board of Regents v. Royal Ins. Co. of America, 517 N.W.2d 888, 892 (Minn. 1994), and must give all terms their plain, ordinary meaning so as to effect the intent of the parties, Davis v. Outboard Marine Corp., 415 N.W.2d 719, 723 (Minn. Ct. App. 1987). If a contract's terms are ambiguous, the court will consider extrinsic evidence, and construction of the contract becomes a question of fact. Id.

Even under the plain, ordinary meaning of the term "sale," we find that the term is ambiguous in the context of selling shares back to the corporation. A sale is defined as "[a] contract between two parties, called, respectively, the "seller" (or vendor) and the "buyer" (or purchaser), by which the former, in consideration of the payment . . . of a certain price in money, transfers to the latter title and possession of the property." Blacks Law Dictionary (6th ed. 1990) at 1337. In this instance, the Barrys transferred their stock to Twin City and received as consideration shares of stock in another corporation, TCF Industries. The definition does not contemplate whether the actual control of the shares must be transferred in a real sense, and we find both Lieberman's and the Barrys' and Twin City's interpretations plausible. There appear to be no Minnesota decisions determining as a matter of law whether a true change of control is necessary for a party to sell shares back to the corporation. We thus remand for a jury to consider extrinsic evidence to determine whether the parties intended that the shares

needed to change control in a real sense before Lieberman's rights under the agreement would be triggered.

The judgment is reversed and the case is remanded for trial.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.