**STUART PARK ASSOCIATES LIMITED PARTNERSHIP and Stuart Park/Summit Partners, Plaintiffs,**

v.

**AMERITECH PENSION TRUST, Ameritech Corporation, and Harris Trust & Savings Bank, Defendants.**

No. 93 C 1817.

United States District Court, N.D. Illinois, E.D.

March 18, 1994.

Harvey Joel Barnett, Ira J. Bornstein, John Alden Fritchey, IV, Barnett, Bornstein & Blazer, Ltd., Chicago, IL, Leonard L. Gordon, Piper & Marbury, Baltimore, MD, Benjamin Sorrells Boyd, Lewis A. Noonberg, David H. Bamberger, Piper & Marbury, Washington, DC, for plaintiffs.

Alfred Winchell Whittaker, Kristen Y. Allman, Kirkland & Ellis, Washington, DC, Frank Cicero, Jr., Ruben Castillo, Anni A. Najem, Kirkland & Ellis, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

The defendants, Ameritech Pension Trust ("the Pension Trust"), Ameritech Corporation ("Ameritech"), and Harris Trust and Savings Bank ("Harris"), move this court for summary judgment.[1] The defendants argue that they are entitled to summary judgment on count I of the plaintiffs' complaint which alleges breach of contract because (1) the contract violates the Employee Retirement Income Security Act ("ERISA") and hence, is unenforceable; (2) the contract never became binding because the plaintiffs failed to fulfil a condition precedent; and/or (3) the contract never became binding because the contract was never actually delivered. The defendants argue they are entitled to judgment on count II of the plaintiffs' complaint because as a matter of law the plaintiffs cannot establish the requirements for promissory estoppel. With respect to the plaintiffs' tort claims, the defendants argue they are entitled to judgment on count IV because the defendants did not owe the plaintiffs the legal duty to act in accordance with good faith and fair dealing. Similarly, the defendants argue that they did not owe the plaintiffs the legal duty to forewarn them that the contract may violate ERISA and consequently, that they are entitled to judgment on count VI of the plaintiff's complaint. Finally, with respect to damages, the defendants argue that the plaintiffs are not entitled to lost profits, punitive damages and/or attorneys' fees. For the reasons set forth below, this court grants the defendants' motion in part and denies it in part.[2]

### STATEMENT OF FACTS

The plaintiffs engage in the business of real estate development. In 1989, the plaintiffs procured a contract to purchase a parcel

---

1. Plaintiffs initially named as additional defendants L & G Realty Advisors, Inc. ("L & G") and Heitman Advisory Corp. ("Heitman"). These parties were dismissed with prejudice on October 27, 1993 by stipulation.

2. This court will refer to Ameritech and the Pension Trust as "the Ameritech defendants." It will refer to Ameritech, the Pension Trust, and Harris as "the defendants."

of land in Arlington, Virginia. (Complaint at ¶ 11). Because the property was located in close proximity to the Washington Metro public transportation system, the plaintiffs considered it an ideal location for a 372–unit apartment complex, to be known as Stuart Park. *Id.*

The plaintiffs contacted L & G Realty Advisors ("L & G") in the hopes of obtaining investments in Stuart Park. *Id.* at ¶ 12. L & G acted as realty investment advisor to the Pension Trust, and it undertook preliminary discussions with the plaintiffs on behalf of the Pension Trust. *Id.* at ¶¶ 12, 13. The plaintiffs understood that the approval of Ameritech was required to commit it to investing in the Stuart Park project. (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at 2) ("Pl.Mem. in Opp.").

However, the parties experienced difficulty obtaining that approval. Although their discussions were encouraging, the parties were unable to attract the attention of Lloyd B. Thompson, the Director of Real Estate Investments for the Pension Trust. *Id.* at 3. Thompson had the authority and responsibility to approve real estate investments for the Pension Trust or to recommend any such investment to the Chief Investment Officer, Judith Mares. (Defendants' Statement of Material Facts as to Which No Genuine Issue Exists at 4–5) ("Def.Stat. of Mat.Facts"). Because the negotiations could not proceed any further without Thompson, the plaintiffs enlisted the assistance of Donald Bennett, a long-time friend of Thompson. (Defendants' Memorandum in Support of Motion for Summary Judgment at 5 ("Def.Mem. in Supp."); Pl.Mem. in Opp. at 2). The plaintiffs agreed to insure that Bennett would receive $350,-000.00 to direct Thompson's attention to Stuart Park and to play a minor role in the negotiations.[3] (Def.Mem. in Supp. at 5; *see also* Pl.Mem. in Opp. at 3).

After Bennett directed Thompson's attention to Stuart Park, the plaintiffs undertook formal negotiations with the Pension Trust.

The defendants allege, however, that Bennett and Thompson had already negotiated their own deal. The defendants contend that Bennett and Thompson agreed that Thompson would recommend to the Pension Trust those investments in which Bennett had a financial interest. (Def.Reply Br. at 2–4.) In return, Bennett would pay Thompson a portion of Bennett's fees and profits. *Id.* Thus, Thompson would receive a portion of the $350,000.00 fee for the Stuart Park transaction. *Id.*

In August of 1990, Mares began to suspect that one of her subordinates was engaged in misconduct, and she retained the law firm of Winston & Strawn ("W & S") to investigate. (Def.Stat. of Mat.Facts at 8). W & S interviewed Thompson in September and October 1990. W & S concluded its investigation in approximately December 1990. W & S ultimately reported to Mares that, in its opinion, Thompson engaged in activity which violated ERISA and directly breached his fiduciary duties to the Pension Trust. (*See* Affidavit of Howard Pearl at 12–13).

On September 27, 1990, the plaintiffs and L & G signed the investment agreement. (Complaint at ¶ 19). Harris, the Pension Trust's trustee, signed it at a later date outside of the presence of the plaintiffs. (Def.Reply Br. at 15). The Pension Trust directed Harris to send the signed agreement to it and to refuse to tender a copy to the plaintiffs. *Id.* In light of the findings of the W & S investigator, the Pension Trust's in-house counsel worried that because Thompson was a fiduciary of the Pension Trust, his misconduct with respect to the Stuart Park transaction constituted an ERISA violation. (Def.Stat. of Mat.Facts at ¶ 17). Thus, she prevented delivery of the contract while she consulted with outside legal counsel. *Id.* On November 14, outside legal counsel reported to the Pension Trust that performance of the Investment Agreement would in fact violate ERISA. *Id.* On November 19, Mares sent a letter to the plaintiffs briefly mentioning the ERISA

---

**3.** By the time that negotiations between the Pension Trust and the plaintiffs concluded, the Pension Trust became responsible for 60% of this fee, $210,000.00. (Defendants' Brief in Response to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at 5 ("Def.Reply Br."); *see also*, Plaintiffs' Memorandum in Opposition at 2 ("Pl.Mem. in Opp.")).

problems and repudiating the Investment Agreement. *Id.* at 18.

Throughout 1991 and the first few months of 1992, the plaintiffs and the defendants attempted to restructure the Stuart Park transaction, to no avail. Consequently, the plaintiffs sued the defendants for breach of contract, promissory estoppel, breach of the duty of good faith and fair dealing, and breach of fiduciary duty.[4] The defendants have moved for summary judgment; each of their arguments will be addressed in turn.

## DISCUSSION[5]

### A. CONTRACT CLAIMS

#### 1. Whether the Doctrine of Impossibility Relieves the Defendants of their Contractual Obligations

The defendants first argue that the Investment Agreement violates ERISA, and, hence, is unenforceable pursuant to the doctrine of impossibility. *See, e.g., Commonwealth Edison Co. v. Allied–General Nuclear Servs.,* 731 F.Supp. 850, 855 (N.D.Ill.1990) (applying Illinois law and stating that if performance of a contract is illegal, the promissor is discharged without liability pursuant to the doctrine of impossibility). The defendants allege that no genuine issue of material fact exists as to whether Thompson was engaged in an illegal kickback scheme. In support of their contention, the defendants have submitted the affidavit of the W & S investigator attesting that Thompson admitted to him that Bennett did business with the Pension Trust with respect to the Stuart Park transaction, and that Thompson was involved in exercising his discretion and judgment on behalf of the Pension Trust with respect to transactions involving Bennett. (Affidavit of Howard Pearl at 6–7). The investigator also testified that his investigation revealed that Thompson accepted substantial sums of money from Bennett during this time. *Id.* at 4. The defendants have submitted invoices which total approximately $40,000.00 from Thompson Capital Corporation ("TCC"), Thompson's wholly owned corporation. (Def.Reply Br., Exhibit 3). The defendants state that Thompson billed Bennett, through these invoices, for Thompson's share of the fees that Bennett earned from the Pension Trust. (Def.Stat. of Mat.Facts at 5–6).[6] This evidence, defendants argue, convincingly shows the illegal Thompson–Bennett scheme.

Interestingly enough, however, the plaintiffs have submitted the most damaging evidence that Thompson was involved in a kickback scheme. (Pl.Mem. in Opp., Ex. 13). On December 20, 1990, Ameritech filed suit against Thompson for the improprieties revealed by the W & S investigation. Shortly thereafter, Ameritech and Thompson entered into a Settlement Agreement. In this agreement, Thompson admits that Bennett profited from the Stuart Park transaction, that Thompson recommended Stuart Park to the Pension Trust, and that Thompson received approximately $40,000.00 from Bennett through TCC. *Id.* at 2–3. In settlement of Ameritech's possible causes of action, TCC agreed to pay Ameritech over $150,000.00, approximately $40,000.00 of which represents Bennett's payments to TCC that coincided

---

4. The plaintiffs have voluntarily dismissed Counts III and V of their complaint, which alleged, respectively, tortious interference with contract and negligence. ("Pl.Mem. in Opp." at 7 n. 4).

5. The court prefaces the discussion of the legal issues with a comment on the choice of substantive law. The Investment Agreement which underlies this litigation provides that the laws of the Commonwealth of Virginia are to apply. (Investment Agreement at ¶ 17.11). However, both of the parties have proceeded under the assumption that Illinois law applies. (*See e.g.,* Def.Reply Br. at 9 (advising this court that "Illinois law is applicable"); Pl.Mem. in Opp. at 5 (arguing what the outcome of the disputes should be "under

Illinois law")). In the Seventh Circuit, "[w]here parties fail to raise a possible conflict of substantive laws, ... the substantive law of the forum controls." *Gonzalez v. Volvo of America Corp.,* 752 F.2d 295, 299 (7th Cir.1985). Thus, we apply Illinois law, regardless of whether under applicable choice of law doctrines one of the parties could have argued that Virginia law controlled the outcome.

6. The defendants have also presented a photocopy of a document which allegedly describes the fee-splitting arrangement. (Def.Reply Br., Ex. 1). The copy that they provided to this court, however, is illegible, and one cannot determine whether it proves the existence of this arrangement.

with Thompson's recommendation of the Stuart Park investment. *Id.* at 4. Taken together, this evidence strongly indicates that no genuine issue of material fact exists with respect to Thompson's involvement in the kickback scheme with Bennett.

Further, the plaintiffs have not presented one jot of evidence to the contrary. *Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215, 1222 (7th Cir.1984) (in defending against a motion for summary judgment, the non-movant plaintiff may not rest upon mere allegations). Indeed, the plaintiffs do not even expressly aver that the kickback scheme did not exist. Rather, they merely attack the defendants' evidence as speculative. (Pl. Mem. in Opp. at 1). Given the plaintiffs' failure to adduce any evidence that Thompson acted lawfully or to assert at least that they in good faith do not believe Thompson acted unlawfully, this court must hold that the plaintiffs failed to meet their burden on motion for summary judgment. *LaScola v. U.S. Spring Communications,* 946 F.2d 559, 563 (7th Cir.1991) (in defending against a motion for summary judgment, the non-movant must demonstrate that the record contains the existence of a genuine issue). Accordingly, we find that Thompson participated in a fee-splitting scheme with Bennett in relation to the Stuart Park transaction.

The defendants proceed to correctly argue that this fee-splitting arrangement violates ERISA. Thompson was a fiduciary of the Pension Trust. As a fiduciary, he was required to act exclusively for the interests of the Pension Trust participants and their beneficiaries. 29 U.S.C. § 1104(a)(1)(A)(i) (1993). By exchanging favorable recommendations for personal monetary gain, it is clear that Thompson was acting on his own behalf and not solely for the Pension Trust participants and beneficiaries. *See, e.g., Whitfield v. Tomasso,* 682 F.Supp. 1287, 1301–02 (E.D.N.Y.1988) (holding that the defendant breached his fiduciary duty by accepting kickbacks); *Martin v. Consultants and Adm'rs, Inc.,* 966 F.2d 1078, 1084, 1089 (7th Cir.1992) (noting that kickbacks violate section 1104 of ERISA); *Anweiler v. American Electric Power Serv. Corp.,* 3 F.3d 986, 990 (7th Cir.1993) (stating that an ERISA fiduciary must act *solely* for a plan's participants and beneficiaries).

Moreover, a fiduciary is prohibited from accepting consideration from a party dealing with a plan if the receipt of the consideration is connected with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b)(3). Here, Thompson accepted money from Bennett. Bennett was dealing with the Pension Trust, as the Pension Trust expressly agreed to pay Bennett $210,000.00. Consequently, Thompson violated section 1106. *See, e.g., Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1214 (2d Cir.1987) (holding that an ERISA fiduciary violates section 1106 by receiving money from a company because of the company's dealings with the pension fund); *Martin,* 966 F.2d at 1084, 1089 (noting that kickbacks violate section 1106 of ERISA). Thus, Thompson violated sections 1104 and 1106 of ERISA.

■ Ordinarily, a contract whose performance would violate federal law is unenforceable and, therefore, neither party can recover on it. *Comdisco, Inc. v. United States,* 756 F.2d 569, 576 (7th Cir.1985). Indeed, in *M & R Investment Co. v. Fitzsimmons,* the Ninth Circuit Court of Appeals held that a pension fund could not be sued for breach of contract for refusing to honor a contract which violated ERISA. *M & R Inv. Co. v. Fitzsimmons,* 685 F.2d 283, 286–288 (9th Cir.1982). However, in the instant case, the Ameritech defendants cannot invoke the defense of impossibility when *their* actions rendered the contract illegal. *First Nat'l Bank of Chicago v. Atlantic Tele–Network Co.,* 946 F.2d 516, 521 (7th Cir.1991) (holding that a party to a contract "cannot make performance impossible and then cry impossibility"); *Comdisco Disaster Recovery Servs., Inc. v. Money Mgmt. Systems, Inc.,* 789 F.Supp. 48, 53 (D.Mass.1992) (applying Illinois law).

In *Comdisco Disaster Recovery Services,* the defendant entered into a contract with the plaintiff in which the plaintiff promised to provide computer services to the defendant in the event that a disaster disabled the defendant's computer system. *Id.* at 50. Subsequently, the defendant was acquired by SunGuard Data Systems ("SunGuard"). *Id.* at 51. This takeover was not hostile; the

defendant had readily participated in it. *Id.* at 54. SunGuard also owned SunGuard Recovery Services, the plaintiff's chief competitor. *Id.* at 51. The defendant ceased performing under its contract with the plaintiff and, argued that it was relieved of its duty to perform because such performance would violate the antitrust statutes. *Id.* at 51, 53. After reviewing Illinois precedent, the court held that a party cannot make performance impossible by positing itself in a position by which contractual performance would violate antitrust laws, and then seek to escape liability. *Id.* at 54 (citing *M.A. Felman Co. v. WJOL, Inc.*, 104 Ill.App.2d 66, 72–73, 243 N.E.2d 33, 36–37 (1968) (holding that "illegality must not have come about because any action or non-action on [the] part of either of the parties to the contract")).

■ Similarly, in the instant case, Thompson's actions violated ERISA and hence, rendered contractual performance illegal. Yet Thompson was the agent, fiduciary and employee of the Pension Trust and Ameritech. (Def.Stat. of Mat.Facts at 4–5). It is well-established that an employee's actions within the scope of employment are imputed to the employer, *Gomien v. Wear–Ever Aluminum, Inc.*, 50 Ill.2d 19, 21, 276 N.E.2d 336, 338 (1971); *Babb v. Minder*, 806 F.2d 749, 752 (7th Cir.1986) (applying Illinois law), even in the context of ERISA litigation. *American Fed'n of Unions Local 102 Health and Welfare Fund v. Equitable Life Assurance Soc'y*, 841 F.2d 658, 665 (5th Cir.1988) (holding that the state law doctrine of *respondeat superior* applies in ERISA cases); *National Football Scouting, Inc. v. Continental Assurance Co.*, 931 F.2d 646, 648 (10th Cir.1991) (same); *Continental Assurance Co. v. Cedar Rapids Pediatric Clinic*, 957 F.2d 588, 589, 590–592 (8th Cir.1992) (applying state law to determine that a fiduciary who embezzled from the plan was the agent of both the pension plan and his employer). Thus, because the Pension Trust and Ameritech share responsibility for rendering the Investment Agreement illegal, they cannot avoid liability by invoking the doctrine of impossibility. Accordingly, this court must reject their argument that they can escape liability for breach of contract because Thompson rendered contractual performance illegal.

■ However, the same does not hold true for defendant Harris. Plaintiffs failed to present any evidence from which one could infer that Thompson could be considered the agent of Harris. Moreover, from the court's independent review of the record, it is clear that Harris and Thompson did not enjoy an agency relationship. To establish an agency relationship, the plaintiff must demonstrate that the defendant had the right to supervise and control the alleged agent and to terminate the relationship at any time. *Illinois Nurses Ass'n v. Illinois State Labor Relations Bd.*, 196 Ill.App.3d 576, 582, 143 Ill.Dec. 469, 473, 554 N.E.2d 404, 408 (1st Dist.), *appeal denied*, 132 Ill.2d 545, 144 Ill.Dec. 257, 555 N.E.2d 376 (1990); *Spivey v. Brown*, 150 Ill.App.3d 139, 143, 103 Ill.Dec. 876, 878, 502 N.E.2d 23, 25 (3d Dist.1986). No evidence exists demonstrating that Harris, as the trustee for the Ameritech Pension Trust, had the right to control Ameritech employees. To the contrary, Ameritech had complete control over Harris. (Trust Agreement between Harris and Ameritech at ¶ 1.3 ("[A]ll instructions and directions to the Trustee [Harris] shall come from the Company [Ameritech]...."); Def.Reply Br. at 15 (stating that Harris is merely Ameritech's "directed trustee" and derives its authority from Ameritech). Because Thompson was not Harris' agent, his unlawful actions cannot be imputed to Harris, and Harris can successfully invoke the doctrine of impossibility. Accordingly, Harris' motion with respect to the breach of the Investment Agreement is granted, and Harris is dismissed from count I of the plaintiffs' complaint.

■ The Ameritech defendants proceed to argue that they are entitled to summary judgment nonetheless because as a matter of law, the plaintiffs were *in pari delicto* with the Ameritech defendants. If the parties to an illegal contract are *in pari delicto*, then the contract is unenforceable and neither can recover. *O'Hara v. Ahlgren, Blumenfeld and Kempster*, 127 Ill.2d 333, 348, 130 Ill. Dec. 401, 408, 537 N.E.2d 730, 737 (1989). The Ameritech defendants aver that the plaintiffs enlisted the assistance of Bennett and insured he would receive $350,000.00 for "little or no work." (Def.Mem. in Supp. at 5). The Ameritech defendants argue that, as

a matter of law, the size of Bennett's fee demonstrates either that the plaintiffs had knowledge of the scheme between Bennett and Thompson or that the plaintiffs introduced Bennett into the transaction to make "sure that Thompson would fail to act prudently." *Id.* at 3.

It is axiomatic that in reviewing a motion for summary judgment, the court must interpret the evidence in the light most favorable to the non-movant. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989). Here, the size of Bennett's fee can simply suggest the plaintiffs' zeal to close the Stuart Park deal. The Ameritech defendants do not dispute that the plaintiffs were unable to elicit consideration from Thompson and the Pension Trust before they enlisted Bennett's assistance. Thus, a reasonable jury could find that the size of the fee suggests only that the plaintiffs believed they were required to pay such a fee in order to stimulate negotiations. Moreover, it appears from evidence submitted by both the plaintiffs and the Ameritech defendants that, in the industry, such fees are common. (Affidavit of William Paulsen cited in Def.Mem. in Supp. at 5 (asserting that "such payments were necessary to get deals done"); Pl.Mem. in Opp., Ex. 11 (in a letter to Judith Mares, the plaintiffs' agent states "[Bennett's] fee was consistent with financing fees paid for securing equity joint venture financing in the real estate industry")). Most importantly, the Ameritech defendants do not present any case law or explanation as to why a reasonable jury *must* infer either that the plaintiffs knew of the kickback scheme or that they intended for Bennett to entice Thompson into violating federal law simply because they agreed to pay Bennett a fee of $350,000.00. Thus, the size of Bennett's fee simply does not demonstrate *in pari delicto* as a matter of law. Accordingly, the Ameritech defendants' motion seeking the dismissal of count I on these grounds is denied.

2. ***Whether the Ameritech Defendants are Relieved of Liability Because the Plaintiffs Failed to Satisfy a Condition Precedent***

The Ameritech defendants also argue they are entitled to judgment as a matter of law with respect to count I because the plaintiffs failed to perform a condition precedent. Under the Investment Agreement, the plaintiffs were required to secure construction financing before November 30 as a condition precedent to any investment by defendants. (Investment Agreement at ¶ 3.6). Plaintiffs failed to fulfill this condition. Plaintiffs correctly respond, however, that, when a party repudiates a contract, the other party is relieved of its duty to perform a condition precedent. *B & C Electric, Inc. v. Pullman Bank and Trust Co.*, 96 Ill. App.3d 321, 328, 51 Ill.Dec. 698, 703, 421 N.E.2d 206, 211 (1st Dist.1981); *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.*, 58 Ill.App.3d 100, 106, 15 Ill.Dec. 517, 522, 373 N.E.2d 863, 868 (3d Dist.1978). The Ameritech defendants repudiated the contract on November 19.

Defendants correctly counter that, be that as it may, to recover for breach of contract the non-breaching party must nonetheless demonstrate that it *could have* performed the condition. *Yale Dev. Co. v. Aurora Pizza Hut, Inc.*, 95 Ill.App.3d 523, 526–27, 51 Ill.Dec. 409, 412, 420 N.E.2d 823, 826 (2d Dist.1981) (citing *Nation Oil Co. v. R.C. Davoust Co.*, 51 Ill.App.2d 225, 238, 201 N.E.2d 260, 266 (5th Dist.1964); *see also Bonde v. Weber*, 6 Ill.2d 365, 381, 128 N.E.2d 883, 891 (1955) (holding that when a party repudiates a contract, the other party must demonstrate it was "ready, willing and able" to perform in order to recover damages). In the instant case, the plaintiffs have conceded that they cannot demonstrate an ability to perform: "[I]t is impossible to determine whether final approval [for a financing commitment] would have been received before November 30, 1990." (Plaintiffs' Response to Defendants' First Request for Admissions at ¶ 1).

The plaintiffs may, nevertheless, be able to recover, however. In Illinois, a party to a contract may not frustrate the other party's attempt to fulfil a condition precedent. *Unit Trainship, Inc. v. Soo Line R.R.*, 905 F.2d 160, 163 (7th Cir.1990) ("Where a party's obligation is subject to a

condition precedent, [Illinois law imposes] a duty of good faith and fair dealing ... to cooperate and to not hinder the occurrence of the condition."). Such conduct represents a breach of the duty of good faith and fair dealing, and consequently, a breach of the contract. *Id.* In the instant case, it is undisputed that the Ameritech defendants refused to deliver a signed copy of the Investment Agreement to the plaintiffs. The plaintiffs allege that this refusal impaired their ability to secure the financing commitment. (Pl. Resp. to Adm. at ¶ 1; Pl.Mem. in Opp. at 10–11). The Ameritech defendants do not controvert this statement. (*See* Def.Mot. in Supp.; Def.Reply Br.). Thus, the plaintiffs may be able to demonstrate that the Ameritech defendants relieved them of their burden of demonstrating that they could have fulfilled the condition precedent. Accordingly, the Ameritech defendants' motion with respect to count I on these grounds is denied.

### 3. *Whether the Ameritech Defendants are Relieved of Their Contractual Obligations Because They Never Delivered the Contract to the Plaintiffs*

Lastly, the Ameritech defendants argue they are entitled to judgment as a matter of law as to count I because the contract was never delivered. They reason that because they never delivered the contract to the plaintiffs, it never became valid. It is undisputed that the Ameritech defendants refused to deliver a signed copy to the plaintiffs once they determined that the Investment Agreement violated ERISA. Delivery, however, is not a precondition to contract formation unless the contract indicates otherwise. *See, e.g., Soderstrom v. Rock River Valley Pigeon Club, Inc.,* 122 Ill. App.3d 819, 820, 77 Ill.Dec. 924, 925, 461 N.E.2d 547, 548 (3d Dist.1984) ("Clearly delivery is not an essential element to the formation of a contract unless the offer specifies actual delivery as an essential part of acceptance of the offer."). The Ameritech defendants argue that the parties in the instant case intended for the Investment Agreement to become valid only upon delivery, because both the letter of intent and the Investment Agreement mention execution and delivery:

In consideration of the financial and other commitments which would be made by the Investor by its *execution and delivery* of the Investment Agreement ...

Upon the *execution and delivery* of the Investment Agreement, the Principals would deliver a separate Project Completion Guaranty....

Within 20 days after *execution and delivery* of the Investment Agreement, the General Partner would cause the Development Partnership to deliver to the Investor an ALTA Form B....

None of the *execution and delivery* of this Agreement ... by the Development Partnership, the Partnership and General Partner will violate any Government Regulation....

The General Partner has delivered to the Investor prior to the *execution and delivery* of this Agreement ...

(Def.Reply Br. at 6–7) (quoting various provisions of the letter of intent and Investment Agreement) (emphases added).

This language is insufficient to show that, as a matter of law, the parties intended for the contract to become binding only upon actual delivery. In *Soderstrom,* the defendant wrote on the contract, "If the above terms are acceptable to the Partnership, please sign and return a copy of the letter to me." *Soderstrom,* 122 Ill.App.3d at 820, 77 Ill.Dec. 924, 461 N.E.2d 547. The court found this language insufficient to graft a delivery requirement onto the contract. *Id.* Similarly here, the mere mention of the words "execution and delivery" in the contract is insufficient to create an actual delivery requirement. Additionally, the Ameritech defendants have cited no cases in which a court held that the mention of execution and delivery in a contract constituted a requirement for actual delivery.

Furthermore, the Investment Agreement expressly states that delivery has occurred. Immediately above the signature lines, the Investment Agreement states, "[i]n Witness Whereof, the parties hereto have caused this Agreement to be executed and

delivered, pursuant to proper authority duly granted, as of the day and year above written [September 27, 1990]." (Investment Agreement at 79). Immediately below this provision, the parties signed the Agreement. Thus, the contract unambiguously states that delivery occurred on September 27, 1990. The Ameritech defendants now wish to argue that although the parties signed a contract attesting that the necessary delivery had occurred, the parties really intended for another type of delivery to effectuate the contract. This argument is unpersuasive because the parol evidence rule bars evidence that contradicts express terms of the contract. *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 199, 56 Ill.Dec. 14, 18–19, 427 N.E.2d 94, 98–99 (1981); *In re Morris Paint and Varnish Co.*, 773 F.2d 130, 133 (7th Cir.1985) (applying Illinois law). Thus, the Ameritech defendants cannot present evidence that the parties intended actual delivery, because such an argument conflicts with an express provision of the signed document. Accordingly, the Ameritech defendants' motion for summary judgment with respect to count I is denied.

### 4. *Whether the Plaintiffs Can Recover Under the Doctrine of Promissory Estoppel*

■ The defendants argue that they are entitled to summary judgment on count II because, as a matter of law, the plaintiffs cannot demonstrate the requirements for promissory estoppel. To establish a claim for promissory estoppel, a plaintiff must demonstrate reasonable and foreseeable reliance to its detriment on the defendant's unambiguous promise. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 309–310, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990). In support of its claim, the plaintiffs allege essentially three sets of promises:

(1) In June 1990 the defendants promised the plaintiffs that the Pension Trust would invest in Stuart Park. In August 1990 the defendants reduced this promise to writing in their letter of intent. ("precontractual promises").[7]

(2) In July 1991 the plaintiffs "were [led] to believe that defendants would invest" in the restructured transaction because the Pension Trust's Asset Management Committee ("Committee") authorized the Pension Trust to invest. ("postcontractual promises").

(3) In September, October and November 1990 the defendants promised the plaintiffs they would invest in Stuart Park in accordance with the terms contained in the Investment Agreement. ("contractual promises").

(Pl.Mem. in Opp. at 9–10; Pl.Compl. at ¶ 42(a)).

■ Under Illinois law, the plaintiffs cannot recover for the precontractual promises. The plaintiffs contend that the defendants "promised [them] that [the Pension Trust] would invest in the Stuart Park project." (Pl.Mem. in Opp. at 9). The plaintiffs ascribe this statement to David Tufaro. *Id.* (citing Affidavit of David Tufaro at ¶ 14). Actually, David Tufaro testified:

In anticipation of the Stuart Park project being presented to the APT Asset Management Committee, and in consideration of the fact that a formal application was being submitted to APT for financing, in mid-June 1990 Stuart Partners ceased negotiations with all other parties concerning financing for the Stuart Park project. The application submitted to APT, by its terms, precluded Stuart Partners from submitting another application to a different equity source until August 1, 1990.

■ Tufaro does not attest here that the defendants promised the plaintiffs that they would invest; he attests only that the plain-

---

**7.** The plaintiffs also alleged that Harris' promise that it would sign the agreement constitutes a promise which would support recovery for promissory estoppel. (Pl.Mem. in Opp. at 9). Yet Harris did sign the agreement. (Complaint at ¶ 19; Def.Reply Br. at 15). It is well established that only broken promises can support recovery for promissory estoppel. *E.g., Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 931 (7th Cir. 1991) (applying Illinois law). Thus, the plaintiffs cannot argue that they were injured by relying upon Harris' promise because Harris fulfilled this promise.

tiffs submitted applications so that the defendants could decide whether to invest. A plaintiff cannot defend against a motion for summary judgment by mis-citing the record, or by alleging a fact for which they have been unable to adduce supporting evidence. *See Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir.1993) ("[A] non-movant plaintiff must present sufficient evidence to show the existence of each element of its case on which it will bear the burden of proof at trial."). Thus, the question is whether Tufaro's statement demonstrates some unambiguous promise on the part of the defendants.

■ Tufaro's statement conveys that the plaintiffs ceased negotiations with other potential financiers because the plaintiffs submitted a financing application and because the plaintiffs anticipated that the Committee would soon consider the Stuart Park project. This statement fails to demonstrate an unambiguous promise. It is impossible to locate an unambiguous promise on the part of the defendants in a paragraph which describes only actions undertaken by the plaintiffs. *See Derby Meadows Util. Co. v. Inter-Continental Real Estate*, 202 Ill.App.3d 345, 361, 147 Ill.Dec. 646, 655, 559 N.E.2d 986, 995 (1st Dist.1990) ("[E]stoppel consist[s] of *words* or *conduct* by one party which is expected or intended to cause action or forbearance on the part of another party. . . .") (emphases added). Indeed, the statement indicates that the plaintiffs ceased negotiations because the *plaintiffs* had submitted various applications. Thus, the defendants' actions did not compel the plaintiffs to discontinue other negotiations; the plaintiffs' actions did. Accordingly, the plaintiffs have failed to demonstrate this was an unambiguous promise.

■ In their complaint, the plaintiffs also alleged that the promises made in the defendants' letter of intent constitute unambiguous promises upon which they could reasonably rely. In their memorandum in support of their motion for summary judgment, however, the defendants noted that the letter of intent was expressly non-binding. (Def.Mem. in Supp. at 8). A plaintiff cannot reasonably rely upon a statement contained in a document expressly made non-binding.

*Mason & Dixon Lines, Inc. v. Glover*, 975 F.2d 1298, 1305 (7th Cir.1992) (holding that a plaintiff cannot reasonably rely upon an oral statement for which he has written documentation stating that he cannot rely upon it as a binding promise). Thus, the plaintiffs could not reasonably rely upon the non-binding letter of intent. Moreover, in their response to the defendants' memorandum, the plaintiffs do not repeat their allegation that the letter of intent supports a cause of action for promissory estoppel. Thus, the plaintiffs have failed to present either evidence which contradicts the defendants' averment or support for the proposition that they were nonetheless entitled to rely upon the letter of intent. Because the plaintiffs have failed to identify a genuine issue of material fact, the defendants' motion is granted as to the plaintiffs' claim for promissory estoppel based upon the letter of intent. Hence, the defendants' motion is granted with respect to all precontractual promises.

■ Similarly, the plaintiffs cannot recover for the postcontractual promises. Plaintiffs assert that the Asset Management Committee's eventual approval of the Stuart Park deal was an unambiguous promise. The Committee's approval did not constitute an unambiguous promise to invest, however, because the plaintiffs admit that they did not know what the Committee approved. (Affidavit of David Tufaro at ¶ 32) ("Prior to the Committee approval, I asked Eric Mayer repeatedly for a detailed written description of what was being presented to the Asset Management Committee. Although Mayer promised he would honor my request, I was never provided with that information."). A promise simply to invest is ambiguous and cannot be reasonably relied upon if the promisee is unaware of the terms of the investment. *Demos v. National Bank of Greece*, 209 Ill.App.3d 655, 661–662, 153 Ill.Dec. 856, 860–61, 567 N.E.2d 1083, 1087–88 (1st Dist. 1991) (holding that a party cannot rely upon a promise to lend money when the parties did not decide the terms of the loan, such as the interest rate). Moreover, a cause of action for promissory estoppel lies only when the defendant *makes* an unambiguous promise or unambiguously *conveys* to the plaintiff

a promise through its conduct. *People ex rel. Nelson v. Village of Long Grove*, 169 Ill.App.3d 866, 875, 119 Ill.Dec. 900, 906, 523 N.E.2d 656, 662 (2d Dist.) (quo warranto proceeding), *appeal denied*, 122 Ill.2d 593, 125 Ill.Dec. 235, 530 N.E.2d 263 (1988). When a corporation's finance committee authorizes a transaction, it cannot be said that it is unequivocally conveying a promise to the third party that it will invest. In-house *authorization* of an investment is not the equivalent of an unambiguous promise *to invest* in the transaction. Thus, the Pension Trust's internal authorization of an investment, the terms of which the plaintiffs did not know, does not constitute an unambiguous promise to invest.

■ Furthermore, a plaintiff must actually and reasonably rely upon the alleged promise. *E.g., Hickey v. Illinois Central R.R. Co.*, 35 Ill.2d 427, 447, 220 N.E.2d 415, 425 (1966), *cert. denied*, 386 U.S. 934, 87 S.Ct. 957, 17 L.Ed.2d 806 (1967); *National Ben Franklin Ins. Co. v. Davidovitch*, 123 Ill.App.3d 88, 93, 78 Ill.Dec. 577, 581, 462 N.E.2d 696, 700 (1st Dist.1984). In April 1992 the plaintiffs wrote a letter to the Pension Trust's investment advisor stating that Ameritech "should be extremely pleased with the results that you have achieved, and it goes without saying that they should accept your recommendation to proceed with [the Stuart Park] project. We look forward to your prompt ratification of the transaction. . . ." (Pl.Mem. in Opp., Ex. 18). Here, because the plaintiffs recognize that the Pension Trust was still consulting with its investment advisor regarding Stuart Park, they evince their knowledge that the Pension Trust did not unequivocally commit itself to Stuart Park. Therefore, plaintiffs could not have reasonably relied on any purported promise to invest. Thus, the defendants' motion with respect to the asserted postcontractual promises is granted.

■ Finally, with respect to the promises made in the Investment Agreement, the defendants argue they are entitled to summary judgment by merely alleging the plaintiffs "have cited nothing in their complaint or depositions that shows an 'unambiguous promise' by defendants" to invest in Stuart Park. (Def.Mem. in Supp. at 8, Def.Reply Br. at 9). Yet the Investment Agreement unequivocally states that Pension Trust is an "investor" in Stuart Park and that it "shall make a capital contribution" to the plaintiff. (Investment Agreement at Recitals C and D and ¶ 1.3). The remainder of the 79-page Investment Agreement describes the terms, conditions, and warranties of this investment and provides a detailed formula for calculating its amount. Moreover, the defendants do not furnish any rationale explaining how the language of the Investment Agreement is ambiguous. Because they have failed to sustain their burden as the movants in a motion for summary judgment, the defendants' motion with respect to promises contained in the contract is denied.

In summary, the defendants' motion is granted in part and denied in part. Recovery for count II of the plaintiffs' complaint will be limited to those promises in the Investment Agreement which the plaintiffs can prove support a recovery for promissory estoppel.

## B. TORT CLAIMS

### 1. Whether the Defendants Owed the Plaintiffs a Duty of Good Faith and Fair Dealing

■ Plaintiffs complain that the Ameritech defendants breached their duty of good faith. (Complaint, count IV). The Ameritech defendants note that Illinois does not recognize a separate cause of action for breach of good faith. This is true. *Bachmeier v. Bank of Ravenswood*, 663 F.Supp. 1207, 1225 (N.D.Ill.1987) (citing *Powers v. Delnor Hospital*, 135 Ill.App.3d 317, 321, 90 Ill.Dec. 168, 172, 481 N.E.2d 968, 972 (2d Dist.1985)); *see also Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir.1992) (noting that "[t]here is no blanket duty of good faith"). Yet as discussed above, a "duty of good faith" does arise from "specific contract terms and obligations" and simply requires a party to refrain from interfering with the performance of contractual obligations, including the occurrence of a condition precedent. *Unit Trainship*, 905

F.2d at 163. As such, "[a] breach of the duty of good faith is a breach of the contract." *Id.* Thus, the plaintiffs can recover for breach of this duty, but only to the extent they can demonstrate that a binding contract existed and the Ameritech defendants frustrated the performance of their condition precedent. Thus, this claim is subsumed within count I which alleges breach of contract. Therefore, the Ameritech defendants' motion for summary judgment is granted with respect to count IV.

It is important to note that the defendants' counsel seemed to be under the impression that the plaintiffs had alleged *Harris* breached its duty of good faith and fair dealing. In the defendants' memorandum in support of their motion for summary judgment, the defendants argue that Harris is entitled to summary judgment because the plaintiffs have not adduced any evidence that Harris acted in "bad faith." (Def.Mem. in Opp. at 13–14). It is difficult to discern how "bad faith" is relevant to the instant case, unless it is used to show the absence of "good faith." Yet the plaintiffs did not allege that Harris breached, or owed to plaintiffs, any duty of good faith. (Complaint, count IV (alleging only that the Pension Trust and Ameritech breached the duty of good faith and fair dealing)). Accordingly, the court need not consider Harris' argument that it did not act in bad faith, because defendants have not shown how such an argument is relevant to this litigation.

### 2. *Whether the Defendants Owed the Plaintiffs a Fiduciary Duty*

The plaintiffs allege that the defendants owed the plaintiffs a fiduciary duty and breached this duty by failing to inform the plaintiffs of the ERISA violations. (Complaint, count VI). Plaintiffs' allegations fall far short of alleging any breach of fiduciary duty. First, the defendants apprised the plaintiffs of the ERISA violations approximately six weeks after W & S suspected Thompson of wrongdoing. Second, it is well-established that "parties to a contract are not each other's fiduciaries." *Original Great American Chocolate Chip Cookie Co.,* 970 F.2d at 280. To support its argument on this issue, the plaintiffs cite case law which indicates exceptions to this general rule. Yet they do not provide any rationale explaining why they believe *they* are excepted from the rule. Because the case law is inapposite, we hold that no fiduciary obligation arose between the defendants and the plaintiffs.

The plaintiffs first cite case law holding that a mortgagor and a mortgagee can occupy the relationship of fiduciaries. (Pl.Mem. in Opp. at 7 (citing *Janes v. First Fed. Savings & Loan Ass'n of Berwyn,* 57 Ill.2d 398, 408, 312 N.E.2d 605, 611 (1974)). However, the plaintiffs fail to provide any explanation, much less adduce any evidence, that the parties are properly viewed as mortgagee and mortgagor. Further, in *Janes,* the Illinois Supreme Court stated that a fiduciary relationship could exist between mortgagor and mortgagee because the plaintiff showed *more* than merely a mortgagee-mortgagor relationship. *Janes,* 57 Ill.2d at 408, 312 N.E.2d 605. Thus, even if such a relationship existed between the plaintiffs and the defendants in the instant case, the plaintiffs have neglected to present the additional facts necessary to elevate a mortgagor-mortgagee relationship to a fiduciary relationship.

The plaintiffs also cite case law holding that joint venturers stand in a fiduciary relationship. (Pl.Mem. in Opp. at 7 (citing *Fitchie v. Yurko,* 212 Ill.App.3d 216, 227, 156 Ill.Dec. 416, 424, 570 N.E.2d 892, 900 (2d Dist.1991)). However, the plaintiffs have failed to demonstrate that a genuine issue exists as to whether the plaintiffs and the defendants were joint venturers. "Whether a joint venture exists is a question of the intent of the parties." *Fitchie,* 212 Ill.App.3d at 227, 156 Ill.Dec. 416, 570 N.E.2d 892. Yet the Investment Agreement explicitly states that "[i]t is not intended by this Agreement to, and nothing contained in this Agreement shall, create any partnership, joint venture or other arrangement between [the plaintiffs and the defendants]." (Investment Agreement at ¶ 17.18). The plaintiffs have failed to present any evidence showing that, despite this provision, the parties nonetheless intended to act as joint venturers. Because the plaintiffs have failed to demonstrate that a genuine issue of material fact exists as to

whether they enjoyed a fiduciary relationship with the defendants, the defendants' motion with respect to count VI of the plaintiffs' complaint is granted.

## C. DAMAGES

### 1. Whether the Plaintiffs Are Entitled to Lost Profits

It is undisputed that Stuart Park was a "new business." Typically in Illinois, a new business cannot recover for lost profits, *Malatesta v. Leichter,* 186 Ill.App.3d 602, 621, 134 Ill.Dec. 422, 435, 542 N.E.2d 768, 781–82 (1st Dist.), *leave to appeal denied,* 128 Ill.2d 664, 139 Ill.Dec. 515, 548 N.E.2d 1071 (1989), because damage calculations must be to a reasonable certainty. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 316, 113 Ill.Dec. 252, 257, 515 N.E.2d 61, 66 (1987). If a business did not exist prior to the defendant's breach of contract, lost profits generally cannot be calculated to a reasonable certainty because the plaintiff cannot offer any figures with which to compare profits after the breach of the contract. *Malatesta,* 186 Ill.App.3d at 621–22, 134 Ill.Dec. 422, 542 N.E.2d 768.

Courts, however, have recognized some factual scenarios in which this rule does not apply. In *Fishman v. Estate of Wirtz,* the Seventh Circuit Court of Appeals upheld a jury verdict awarding lost profits to an unsuccessful bidder for the Chicago Bulls, as the bidder could demonstrate reasonable certainty by presenting evidence of the profits made by the previous Bulls franchise owners. *Fishman v. Estate of Wirtz,* 807 F.2d 520, 555–58 (7th Cir.1986). Similarly, in *Milex Products v. Alra Laboratories,* the Illinois Appellate Court allowed lost profits to a new business that had sought to engage in the manufacture of a fungible drug that its competitors had sold for quite some time—clomiphene citrate. In that case, the plaintiff could estimate its lost profits by using the pre-breach profit history of its competitors. *Milex Products, Inc. v. Alra Labs, Inc.,* 237 Ill.App.3d 177, 191–92, 177 Ill.Dec. 852, 862–63, 603 N.E.2d 1226, 1236–37 (2d Dist.1992), *appeal denied,* 149 Ill.2d 651, 183 Ill.Dec. 863, 612 N.E.2d 515 (1993). The instant factual scenario is not analogous.

In the instant case, the plaintiffs and the defendants sought to build an apartment complex on a barren piece of land. The plaintiffs argue that this falls within the ambit of these exceptions. The court disagrees. Unlike the Chicago Bulls and clomiphene citrate, Stuart Park did not exist prior to the defendants' alleged breach of contract. Indeed, it does not exist now. Thus, unlike the plaintiffs in *Fishman* and *Milex Products,* the plaintiffs here cannot ascertain their lost profits by referring to another entity's profit history. These few decisions which declined to apply the "new business rule" are inapposite and do not work to defeat the rule in this case. Because the "new business" rule applies, the plaintiffs cannot recover lost profits. Accordingly, the defendants' motion for summary judgment with respect to the portion of Paragraph B which prays for lost profits is granted.

### 2. Whether the Plaintiffs are Entitled to Punitive Damages

The plaintiffs argue they are entitled to punitive damages, reasoning that punitive damages are appropriate if the defendant breaches a fiduciary duty. (Pl.Mem. in Opp. at 13 (citing *Jerry Clark Equip., Inc. v. Hibbits,* 245 Ill.App.3d 230, 241, 183 Ill.Dec. 931, 948, 612 N.E.2d 858, 865 (5th Dist. 1993)). As discussed above, the plaintiffs cannot demonstrate that any such duty existed. Thus, we grant the defendants' motion and strike Paragraph C of the plaintiffs' prayer which seeks punitive damages.

### 3. Whether the Plaintiffs are Entitled to Attorneys' Fees

The Investment Agreement expressly provides that the Pension Trust will reimburse the plaintiffs for the attorneys' fees they incur in connection with the Pension Trust's failure or refusal to honor the agreement. (Investment Agreement at ¶ 14.2). The Ameritech defendants argue that the plaintiffs cannot recover attorneys' fees under an illegal contract. However, as discussed above, the Ameritech defendants may be unable to escape contractual liability although contractual performance would vio-

late ERISA. Therefore, the Ameritech defendants have failed to demonstrate that no genuine issue exists as to whether the plaintiffs are entitled to attorneys' fees under the Investment Agreement. To the contrary, it appears that the plaintiffs may be entitled to them. As such, the defendants' motion for summary judgment regarding attorneys' fees with respect to the Ameritech defendants is denied.

■ The defendants' motion, however, is granted with respect to Harris. The Investment Agreement provides that the Pension Trust will reimburse the plaintiffs for attorneys' fees. It does not state that Harris will reimburse them. In the absence of contractual or statutory authority allowing the recovery of attorneys' fees, it is well-established that a plaintiff cannot recover them. *E.g., Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.*, 882 F.2d 221, 227 (7th Cir.1989) (applying Illinois law). Because the plaintiffs have not adduced any such contractual or statutory authority, the defendants' motion regarding attorneys fees is granted with respect to Harris.

Finally, the court briefly summarizes for the parties some of the genuine issues of material fact remaining for trial:

(1) With respect to count I, whether the plaintiffs can show that the Ameritech defendants interfered with the plaintiffs' attempt to fulfil their condition precedent of obtaining a finance commitment;

(2) As a defense to liability on count I, whether the Ameritech defendants can show that the plaintiffs were *in pari delicto* with them;

(3) With respect to count II, whether the plaintiffs can prove that the Investment Agreement contains promises which could support recovery for promissory estoppel against the Ameritech defendants and/or Harris;

(4) If the plaintiffs prevail, what are their damages, excluding lost profits and punitive damages. Attorneys fees would be recoverable only from the Ameritech defendants.

### CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is granted in part and denied in part. Counts IV and VI of the plaintiffs' complaint are dismissed with prejudice. Paragraph C of the plaintiffs' prayer for damages and the portion of paragraph B which prays for lost profits are hereby stricken. The plaintiffs' recovery under count II of the plaintiffs' complaint will be limited to those promises in the Investment Agreement which the plaintiffs can show support a recovery for promissory estoppel. In addition, Harris is dismissed as a defendant from count I. Harris is also dismissed from the plaintiffs' prayer for relief requesting attorneys' fees.